## PAGE vs. SCHEIBEL.

1. What constitutes a common field lot within the meaning of the act of Congress of 1812, is a matter of law, and to be determined by the court.

2. It is not necessary to shew a concession or any authoritative act of the Spanish Government to shew title to such a lot, the act of Congress having made possession, cultivation, or inhabitation before 1803, evidence of title.

3. The act of 1812 was not intended to confer title on those who had abandoned their claims to the lots mentioned in the act, but to the last *claimant* who had not abandoned.

4. Removing from the village and ceasing to cultivate the lot, do not alone amount to an abandonment. To constitute an abandonment, there should be a removal with an intention to abandon, or some act amounting to a disclaimer of title.

5. It was not necessary under the act of 1812, that the claimant should file a claim with any officer of the federal government, the act of 1824 not being obligatory upon the claimants. That act only enabled them to procure documentary evidence of title.

6. The act of 1812, *proprio vigore* conferred title on the claimants, and no further act was necessary on the part of the government.

7. The recorder had no power under the act of 1812 to confirm any title on a concession; he was authorized only to act upon inhabitation, cultivation, or possession.

8. Where a concession described the land as in Grand Prairie, and bounded by Little River, although the recorder in his confirmation refers to Little River as the boundary, as in the concession, if it be shewn that Grand Prairie did not in fact touch Little River, and that the lot was in Grand Prairie common fields, the boundary of Little River must be rejected.

## ERROR to St. Louis Circuit Court.

GAMBLE & BATES, *for Plaintiff in error.*

1. The 9th instruction asserts that though Martin Coontz may have conveyed the land in New Madrid, in lieu of which the recorder's certificate was issued to James Tanner, and though the plaintiff derived title regularly under Tanner, yet the legal title to the land located in the name of Coontz or his legal representatives, vested in Coontz and not in Tanner, or those claiming under him; and therefore that the plaintiff was not entitled to recover. This is clearly contrary to the decisions of this court in Kirk's heirs vs. Greene's heirs, 10 Mo. R., 252; Mitchell and wife vs. Tuckers, Ibid, 260; Montgomery and wife vs. Landusky, 9 Mo. R., 714.

2. The second clause of the second instruction asserts that if the premises in dispute were a part of a tract of land which had been cultivated or possessed as private property prior to the 20th December, 1803, and known as a common field lot in the Grand Prairie common fields of St. Louis, the plaintiff was not entitled to recover.

One matter of fact controverted between the parties, was whether the property in question was within the Grant Prairie common fields. The court puts the question to the jury to be determined

by them as a question that may decide the case, whether the land was known as a part of a common field lot—when known? By whom known?

3. The third instruction asserts that if there were tracts of one or more arpents front by forty deep, possessed and cultivated as common field lots adjoining those which were granted and used and occupied in the same manner as those which were granted, then the tracts so occupied and cultivated, were common field lots confirmed by the act of 13th June, 1812.

This instruction contains the broad assumption as a matter of law, that the possession and cultivation of tracts of a particular shape adjoining the lots granted in a common field, makes such tracts common field lots, without any evidence before the courts of the manner in which such lots were originally appropriated to private use, or of any assent or of facts from which the assent of the Spanish authorities could be inferred. For let it be remembered, that the same law must exist in relation to land adjoining the common field of any other of the Spanish villages at a distance from the residence of the Lieut. Governor as may be declared to exist in relation to this land near St. Louis, and so the fact, that the Lieut. Governor resided at St. Louis would not justify the inference that such assent was given.

4. The fifth and sixth instructions are directly opposed to each other on the case as it was made in evidence. The fifth decides that the confirmation under the act of 1816, is no bar to the plaintiff, unless the grant to Calve in Livre Terrein No. 1, page 17, covers the land in dispute; while the sixth decides that the confirmation is for the land possessed by Calve, without regard to the grant in Livre Terrein. The sixth instruction construes the confirmation erroneously, in declaring that the land possessed is that to which the confirmation applies. The confirmation refers to Livre Terrein for the description of the land confirmed.

5. The seventh instruction refers to the jury the question of the proper legal construction of the confirmation, whether the confirmation was of the tract which was cultivated and possessed by Calve under the grant, without regard to the calls of the grant. Having in the sixth committed the error of declaring that the land possessed by Calve was that which was confirmed, the further error is here committed of referring the construction of the written confirmation to the jury.

6. The eleventh instruction asserts that the plaintiff has shown no title to any lands within the Coontz' survey, which was at the time of the location embraced in any private claim, whether such claim was surveyed or not.

This instruction cuts off all pretence of title in the plaintiff to any land in the Coontz' survey, which was at the time of location claimed by any other person, no matter how or upon what title. The explanation of this remarkable instruction is given by the counsel, in claiming that the application by McKnight and Brady to the surveyor general, to have the certificate located so as to exclude lands claimed by other individuals, operates so as to control the whole title derived from the survey and location, and to make the title from the government invalid, if any other person at the time had any claim to the land, though the claim then was of no validity in law, or may have since been determined to be a mere shadow.

The application to the surveyor to which such potent effect is given, forms no part of the plaintiff's title. Bagnell vs. Broderick, 13 Peters.

The twelfth instruction asserts that the plaintiff can have no title to any land that ever was a common field lot. This is upon the assumption that it must belong in either to some private person or be reserved for schools. This is altogether a mistake, as no lot in the Grand Prairie fields is included in the out boundary of the town as run under the 1st sec. of the act of 1812, and consequently the schools can have no claim to it.

7. The first and second instructions asked by plaintiff and refused by the court are directed to the survey of the Calve claim, made under the confirmation by the act of 1816. The plaintiff insists, that the survey under that confirmation must be of land bounded by the Little River, as called for in the grant confirmed, and although the confirmation may be held to describe the land as in the fields of the Big Prairie, the two descriptions are consistent. The grant calls for the Little River as in the Grand Prairie; the confirmation is of the land mentioned in the grant, and also

says, it is in the fields of the Big Prairie, both the grant and the confirmation assert that the Little River is in the Grand Prairie. Although the testimony in this case shows that the Little River is distant from the land in controversy, it does not appear that it is not in the Grand Prairie, nor does it appear that there are not fields on the Little River, which have been called fields in the Big Prairie.

But if the description in the grant is specific, and the confirmation is of the land granted, that description must prevail over a more general description inconsistent therewith in the confirmation.

The third instruction asked by plaintiff denies, and proposed that the court should deny, that the act of 1812 confirmed the lot now claimed as Calve's, unless it was a common field lot; and the fourth instruction proposed to the court to say that such lots could only have a legal existence by an extension of the common fields under Spanish authority by grants or survey so as to embrace the land in dispute within the common field. The sixth instruction asked by the same party, requires that there should have been some authoritative recognition of the common field lots claimed under the act of 1812, and that mere cultivation of land contiguous to the common field would not authorize the inference that such land was a common field lot.

These instructions all rest upon the basis that as it appears from the instructions of Morales, Gayoso & O'Reily, that the mode of appropriating any portion of the Royal Domain to the use of any individual was either by grant or order of survey, therefore, some grant or some official recognition of the existence of a common field must be shewn, and must be shewn to embrace the land in dispute in order to its being legally regarded as a common field lot so as to be confirmed by the act of 1812. The acts of 1805, 6, & 7, under which settlement rights have been granted by the United States, have no tendency to shew that the Spanish Government countenanced settlements on the Royal Domain according to the good pleasure of individuals.

The fifth and seventh instructions asked for plaintiff, assert as the law, that the act of 13th June, 1812, in confirming the claims of the inhabitants of the different villages, used the term "inhabitants" as descriptive of the persons who were to take under the act, and did not design to give to any person who might have been an inhabitant of each one of the villages named in the act, the lots and lands which he might have occupied while thus wandering around the circle of these different villiages.

These remarks on the different instructions, will put the court in possession of our views on the most important points of the case. There are other instructions upon which no remarks will now be made.

### SPALDING & TIFFANY, & GEYER, *for Defendant in error.*

I. The first and second instructions of the plaintiff, which call upon the court to pronounce the survey of the Calve confirmation erroneous, if the land designated as such confirmation be not bounded by "*Little River*," were rightly refused by the court.

1. The concession was located there, as understood by Calve and by the Spanish authorities, as Calve took possession and cultivated there, two by forty arpents, and the Government permitted it. See the confirmation upon a possession running back to 40 years before 1812; (about to 1770.)

2. The confirmation was a grant of the claim as filed and exhibited before the recorder. The entry on his books is, "Joseph Calve claiming 2 by 40 arpents of land, Big Prairie fields, St. Louis concession, Livre Terrein No. 1, folio 17; same witness, Auguste Chouteau, same as to cultivation to-wit, 'this lot cultivated forty years ago and till fence was taken down.'" This accompanies the concession of the land lying in the Big Prairie, (La Grande Prairie,) bounded one side by widow Mareschal, and on the other by Little River.

On this the recorder confirms on possession prior to 1803.

3. No possession or cultivation was proved of Calve in any other place in the Grand Prairie or near St. Louis at any time.

4. This concession could not be located pursuant to its calls in the Cul de Sac common fields;

it was to be in the Grand Prairie, not in the Cul de Sac, or Barriere des Noyers or Little Prairie; in all which places the villagers of St. Louis had common fields.

5. The *place where*, to-wit, *in the Grand Prairie common fields*, was a controlling call in the confirmation, and if there is a conflicting call as to one of its boundaries, the court must yield to the former.

6. The land granted has four boundaries. Two of them only are given as being in 1768, on one side *widow Mareschal,* and on the other the *Little River;* as to one of them, the *widow Mareschal,* not a particle of testimony is given, which is not strange after this lapse of time; as to the other, it is proved that there is a stream so called, a mile or so distant at the south east, *but not in Grand Prairie.* The only other things before the recorder, and forming an integral part of the confirmation, and which are descriptive of the land granted, are *that the land was situate in the Grand Prairie common fields,* and that it had *been possessed from* 1770 *down to the time of the destruction of the common fence,* which was proved to have been some 5 years before the change of Government.

7. This grant, (the confirmation to Calve,) is not void for want of description, if the Spanish authorities located it where we claim it to be; if Calve accepted the location there and cultivated it as he did; if it was the only tract ever conceded to or cultivated by Calve in the *Grand Prairie;* if it was the only common field lot ever cultivated by him in the common fields of St. Louis any where; notwithstanding the absence of proof that widow Mareschal bounded one side in 1768, and notwithstanding it should be admitted that the boundary on the other side of the *Little River,* is an impossible one; 3 Peter Rept., 320; 6 Peters R., 328, 345.

8. The land granted by confirmation to Calve, is the land in the Grand Prairie, *possessed* and *cultivated* by *him prior to* 1803; and it was confirmed to him on his possession, and *because he had possessed it.* The confirmation is accompanied by an order of the recorder *for a survey.* Of course, in making the survey of a confirmation based upon possession, a governing circumstance would be that very *possession.*

II. The third instruction asked by plaintiff below, though stated to have been refused, was given, and is number five (5) of the instructions actually given by the court.

III. The fourth instruction of plaintiff is incorrect in that it assumes, that the act of Congress of 13th of June, 1812, could not confirm the land in question, unless it were a common field lot of St. Louis. It takes from the jury the inquiry whether it was an *"out lot."* That act confirmed *out lots* equally with *common field lots.*       ʼ

The establishment, called town, under Spanish Government, had lots, out lots, commons, &c. See the case of Strother vs. Lucas in 12 Peters Reports.

IV. In the fifth instruction asked by the plaintiff, it illegally assumed that a *"common field lot"* could not be made such by *use* of the cultivator, and *permission* and *acquiescence* of the Spanish Government. The question here is, what were *common field lots* in the true intent and meaning of the act of Congress of 13th June, 1812? The answer is, *those strips of ground which together make up the tract or parallelogram used by the villagers formerly for raising their · crops, &c.,* before they began to cultivate separate farms, whether such strips had been granted or not, or surveyed or not. It is sufficient if they were in the tract; *used as common fields,* and were themselves so *used* and *claimed.* Geyer's Digest, 452; sec. 2, page 460; sec. 1, page 463; sec. 2, page 446; article 20, 22.

V. The sixth and eighth instructions for plaintiff, are based on the assumption that Calve's removal from St. Louis to Florissant, and ceasing to cultivate or make claim to any land in said common field, would prevent the operation of the art of 13th June, 1812, to confirm the land; which assumption is unsound.

1. Because this takes from the jury the right of finding whether Calve *abandoned* the land; for it is admitted that under the Spanish laws, which prevailed here till after 1812, if Calve *abandoned* the land he lost all right thereto, and if it were a common field lot, it would belong to the public

schools, unless some other took possession. 1 Partidas 365, law 49 & 50; 12 Peters, 456; 6 Mo. R., 330; 3 Mo. R., 368.

2. Because *abandonment* by the Spanish law was quitting the possession with the intention that it should no longer *be his property.* That is the definition of it in the Partidas. Removing to Florissant and changing his domicil, and no longer *cultivating* or *claiming*, may be evidence of *abandonment*, but they are not *abandonment* itself.

3. Because ceasing to *claim* or *cultivate* land is no forfeiture of right. If ceasing to claim, means that he was silent, said nothing about his land, it could not be held to be a relinquishment of his right so that the confirmation would not be to his benefit.

4. Because the plaintiff below gave in evidence the claim of Calve to this lot preferred before the recorder and filed there, and therefore his instruction is substantially to discredit his own testimony. He shows by documentary evidence that this claim was made before the recorder, and proof taken upon it, and then asks instructions, upon the hypothesis that there was no such proof.

5. Because no such construction is *required* or even permitted by the several acts of Congress authorizing confirmations, passed 2d March, 1805; March 3, 1807; see Geyer's Digest, 452–3, sec. 1 & 2, and p. 464, sec. 3; also act of 12th April, 1814; Geyer's Digest 475, sec. 1 & 2, p. 467, for act of 1812.

VI. The seventh instruction asserts that were cultivation of land contiguous to the common fields does not authorize the inference that it is a common field lot, without showing some authoritative act of the Spanish Government recognizing it as such. See the fourth point above for remarks applicable to the doctrine here assumed.

The shape of the tract cultivated, its relative position compared with the known and recognized common fields; the manner in which it was used and cultivated; and the length of time; whether it was bounded on the outside by a continuation of similar strips of ground, all lying in the same range and cultivated by the villagers in the same way; whether in Spanish times, generally known and spoken of and claimed as the lots of the cultivators, &c., &c.; in short, all these circumstances and every thing also predicable of the real common fields might exist, and yet according to the instructions asked, such pieces of land could not be common field lots unless the Government by some act constituted them such.

VII. The ninth instruction of plaintiff shuts out from the jury the consideration, whether the land in question was an *"out lot"* and declares the law to be that the land in question was not confirmed by the act of 13th June, 1812, unless Calve *claimed it as a common field lot.*

The jury are to judge whether the ground in question, *shaped* as it was, and *used* as it was, was a common field lot; *whether it was in the common fields or not;* and if it was not in the common fields, it was yet a lot claimed and cultivated by Calve while an inhabitant of the village, and the jury were to judge whether it was an *out lot.*

VIII. The tenth and eleventh instructions of plaintiff, relate to his title. The tenth is a mere abstract proposition and has no bearing on the case except as coupled with the eleventh, and if given alone could do neither good or evil, both together assert the position that the defendant's testimony relative to his cultivation of the land in question, cannot affect the title under the New Madrid location.

1. Now, the cultivation could affect the title only in case the land was either an *out-lot* or *common field lot.* If it was either of those, and was cultivated prior to 20th December, 1803, then the act of 13th June, 1812, operated upon it to give it to Calve, or to reserve it for the schools, thus defeating the plaintiff's title. So that cultivation has every thing to do with the question of title.

2. The regularity of the several strips in the Coontz title cannot prejudice this defence; for if this ground was a common field lot or out lot cultivated under the Spanish Government, the title of it was disposed of, before the act for the relief of the New Madrid sufferers was passed. The holder of Coontz certificate, could accomplish nothing by locating it on lands already disposed of

by the United States, notwithstanding his title papers were ample to bar all claims of the United States.

IX. The first instruction given by the Court is on the plaintiff's title, and the plaintiff cannot object to it as it is in his favor, except perhaps, for the reason that it is not strong enough in his favor; but if this did not go far enough, why did he not propound stronger instructions? This is good law so far as it goes.

The defendant might object to it as too stringent against him, as it prohibts the jury from finding the land in question to have been an out lot.

X. The second instruction given by the Court simply announces the effect of the act of 13th June, 1812, in disposing of all the common field lots, either by confirming them to individuals, or reserving them for the use of schools.

XI. The third instruction asserts a construction of the act already considered, to-wit: that lots of the same shape and size, and lying with the *admitted common fields and used like them* under the Spanish Government, are *common field lots* within the meaning of that act.

XII. The fourth instruction given merely sets up the confirmation as the better title, if the jury believe it was confirmed on Calve's possession.

XIII. The sixth instruction given declares the abstract from the Recorder's books containing the confirmation to Calve, to be *evidence* that the lot confirmed was in the Grand Prairie common fields;° and that the confirmation was of the lot as *cultivated* and *possessed* by him prior to 20th December, 1803.

It is only necessary to look at the document to see the correctness of this position

XIV. The seventh instruction involves the point already considered relative to the effect on the confirmation of the call in the concession for *Little River.* See the first point above. It merely, declares that the grant is not void by that misdescription, if it be one.

XV. The eighth asserts that the United States survey of that confirmation is evidence of the extent and boundaries thereof against the plaintiff. Of course it must be, as the title by the confirmation is prior in time, and takes precedence of the New Madrid location, that claim must of course be satisfied according to the true meaning of the confirmation before the Coontz certificate can operate upon the land.

XVI. The ninth instruction given by the Court, declares that the jury are to believe Martin Coontz to have been the owner of the lands in lieu of which his certificate issued, or they must find for defendant.

The statute of the State in force at the time, enacts that the *prima facie* title of the New Madrid location is rebutted by the proof that he was not the owner of the injured land, at the time the certificate of new location issued. The instruction is too large, but if on that account erroneous, it is an error in favor of the plaintiff below. 10 Mo. R., 254, Kirk's heirs vs. Greene's heirs; 10 Mo. R., 260, Mitchell & Coxe vs. Tucker.

XVII. The tenth instruction given by the Court, laid down the principle that the location and survey made under the said certificate, if they affected the title of the land in question, vested title in Coontz, and not in Tanner, or McKnight and Brady; and plaintiff, to recover, must show a conveyance from Coontz or his legal representatives.

This doctrine is supposed to be laid down in the case of Broderick vs. Bagnell, 13 Peters Rep. See Rev. Code of 1845, page 442, secs. 12 and 13; and it is recognized in the act of Assembly of 11th Feb., 1839. That last mentioned act applies only to cases where the litigation is between the different claimants under the same New Madrid location.

XVIII. The eleventh and thirteenth instructions given, merely reiterate the position that the confirmation, if covering the premises, will bar a recovery; and that if the premises lie in one or more St. Louis common field lots of the Grand Prairie, they are not affected by the plaintiff's New Madrid location.

XIX. The twelfth instruction is based upon the phraseology of the *notice* and *act of location* of the New Madrid certificate. It reads that McKnight and Brady legal representatives of Martin

Coontz locate the certificate on *such part of fractional sections* 10 *and* 15 *as is not embraced by other private claims,* and so much of section nine as will make the quantity. The large map-of the Township given in evidence by the plaintiff, shows the premises in controversy to be in one of those sections first named.

1. The final title has not emanated on the New Madrid claim, but it rests yet on the *location* as made by the *party* and sanctioned by the Surveyor and Recorder; but as the *written notice and claim* of the party waives all interference with *private claims,* and as the *party* himself by the first section of the act of 17th Feb., 1815, is authorized to *locate,* it follows that the survey has not been made acccording to the *location* of the party, if it has been so made as to interfere with a private claim.

2. The *notice* is a part of the title. It is filed with the Surveyor, and a copy of it, with the plat, is sent to the Recorder of land titles and recorded there, which is an appropriation of the land. 13 Peters, Broderick vs. Bagnell.

NAPTON, J., *delivered the opinion of the Court.*

This was an action of ejectment, brought by Page against Scheibel, to recover a tract of land in St. Louis county. A verdict and judgment were given for the defendant.

The plaintiff's title was derived from a New Madrid location of 640 acres, under certificate no. 145, and is the same in its details, as set forth in the statement of the case of Page vs. Hill—determined at the present term. The location of McKnight and Brady was on such parts of fractional sections 10 and 15 as are not embraced by other private claims, and the residue to be taken from the east side of fractional section 9, T. 45, R. 7.

The defendant relied on a confirmation under the act of Congress, of June 13, 1812, and April 29, 1816, and for this purpose, gave in evidence:

1. A patent certificate issued by the Recorder of Land Titles in 1845, to Joseph Calve's representatives for 80 arpens of land, certifying that the same had been confirmed, and surveyed.

2. The official survey accompanying said certificate, of a tract of land of two arpens in width by forty in depth: "Situate in the Grand Prairie common field of St. Louis, and confirmed to the extent of eighty arpens by the act of Congress of 29th April, 1816." The plat represents this as bounded on the north by Chancellier's representatives, and on the south by Dunnegan, alias Beauvoisier, and the field notes call for the lines of those claims.

3. The survey of the Grand Prairie common fields, and the New Madrid location of Martin Coontz. From this survey, it appears that the lots of Dunnegan's and Calve's are the southernmost lots, and that the survey of the Coontz claim, cuts off and includes about two thirds of the Calve lot, from the eastern end.

4. The confirmation of Calve's claim by the Recorder. From the minutes of the Recorder, it appears that on the 28th Nov., 1812, Th. F. Riddick and others filed a paper in the office of Frederick Bates, Recorder, &c., requesting him to record the registered concessions, No. 1–2–3–4–5 & 6, in Livre Terrien. From the same book, it appears that the Recorder made the following minute of Calve's claim: "Joseph Calve, claiming 2 by 40 arpens—Big Prairie fields—St. Louis.—Con. L. T. No. 1. folio 17.—Same witness, to-wit, (Auguste Chouteau.) Same as to cultivation, to-wit: "This lot cultivated 40 years ago and till fence was taken down." The concession was dated April 30, 1768, and was signed by St. Ange and Labuxiere. It was of a lot, 2 by 40 arpens, in the Grand Prairie, bounded on one side by the widow Mareschal, and on the other by Little River. The tabular statement of this confirmation, referred to Provincial Land Book, vol. 1, p. 17, for the concession stated that it was not surveyed, that it was situated in the fields of St. Louis Big Prairie, and that it had been possessed and cultivated prior to 1803.

5. The defendant also gave in evidence a certificate of confirmation, dated July 6th, 1844, by the then Recorder, of a lot one by forty arpens, to F. Dunnegan, which was immediately south of and adjoining to the lot of Calve. The survey of this lot was also given in evidence.

6. A survey made by the County Surveyor in this case, of the Calve tract and the New Madrid location of M. Coontz, was given in evidence, with the oral testimony of a clerk in the Surveyor's office, stating that this lot, along with others, was originally surveyed about the year 1835; but that the surveys of so many of these lots as projected eastwardly about 9 arpens, were not put down on the township plats until recently. This witness also stated, that there was a survey in the *Cul de Sac*, in the name of Joseph Calve, which was found to be incorrect; there being but one confirmation. and was not approved. Extracts were read from *Livre Terrien* No. 2—containing surveys made by Martin Duralde, in 1770—1771 and 1772 in the Grand Prairie. This document is signed by the Lieut. Governor, and many of the inhabitants, to authenticate the concessions which had been made verbally or in writing. One of these surveys (that of the lot of Picart,) explained the manner in which the offset of nine arpens to the east occurred.

7. The defendant also gave testimony, tending to show cultivation of Calve's lot previous to 1803. *Antoine Smith,* a witness, seventy-five years old, stated that he came to this country from Canada fifty-four years ago—knew Joseph Calve and his sons—who removed to Florissant about 2 years after witness came to the country, (1793)—knew of

Calve's cultivating land in the Grand Prairie—that Calve cultivated there in 1791—witness worked on the land of Joseph Calve and Fr. Mareschal. The whole Grand Prairie and Cul de Sac was then in cultivation. Witness worked two years; made two crops on Calve's land, cutting hay and wheat. The first two years witness was in this country, he worked for Chouteau; he also worked with Calve's sons, Joseph and Benjamin. Witness then went to New Orleans and remained two years, and after his return, Calve and his family were at Florissant. The land he had formerly worked, was still in cultivation, but by whom, witness did not recollect. The common fence went down about five years before the change of Government. This fence enclosed the commons—and consequently protected the fields, both in Grand Prairie, Cul de Sac, Little Prairie, &c., from the cattle of the villagers, which were kept within the commons. There was no fence between the fields—a plough furrow marked the division line. Others cultivated both north and south of Calve. The first on the north was Lewis Chancellier, the next Kierceraux, next Mainville Dechesne. Neither Routier nor Langlois were there. The first on the south was Dunnegan; the next Jacques Mareschal's. Witness worked Calve's land after Calve's removal to Florissant, for his son. The land looked as if it had been cultivated a long time. Witness had been on the land frequently since the change of Government, and cut hay on it for himself for four years after the Americans came. Two years ago, (before the trial,) witness was sent for to point out the land. Before going on it, he stated the mark—two cotton wood trees, one on the land of J. Mareschal, and the other on Chancellier's land, and that it bounded east by a sink hole, which was more to the south than the north, and belonged to a piece of vacant land. Was with Mr. Cozzens (the surveyor) when they found a corner—dug and found cement, and put another stone there, a corner stone between Kiercereaux and Dechesne, belonging to the entire square of the common field. The sink hole, witness stated, is still there, but the cotton wood trees are cut down. The stump of one is still there, that of the other was burned and dug up. Those trees were resorted to by the laborers for rest and smoking. Trees were scarce. The lines between the fields are easily distinguishable, because three or four feet were left unploughed. Every spring, in order to preserve the road, a few furrows were thrown up on each side, to keep the passage in repair. The villagers had no separate farms. Calve claimed there 2 by 40; Dunnegan, 1 by 40; and Chancellier, 2 by 40. Witness did not know of Calve cultivating any other land in the Grand Prairie or Cul de Sac. Witness knew Scheibel's

store house, and that it stands on the land he worked of Calve. Witness stated many particulars in relation to Calve's family and descendants— and gave the names of several persons who cultivated south of Calve— but knew no stream in Grand Prairie called Little River. The witness had married a niece of Calve, and could neither read nor write—he was examined in great detail, but what has been stated is sufficient to show the general tendency of his evidence.

8. The defendant then gave in evidence the patent certificate to Louis Chancellier, No. 1195, for 80 arpens, stating that the land was confirmed to his representatives; and the official survey of this lot. The testimony of the U. S. Surveyor was given to show how the eastern line of this lot, the Calve lot and the Dunnegan lot, was found. At the corner of the set off, where the base line of the Grand Prairie common fields, extended nine arpens east of the line of the northern lots, a stone was found, and under it was found dross or cinders from a blacksmith's forge. It was also proved that marks of ancient cultivation were still visible north and south of the Calve lot.

9. The defendant gave documentary evidence of his derivative title from the heirs of Joseph Calve.

The plaintiff in rebuttal gave in evidence:

1. The original concession to Louis Chancellier, dated January, 1767, granting to him 2 by 40 arpens in the Grand Prairie, "bounded on one side by John Baptiste Hervieux, and on the other by ——, on condition of improving the same within a year and a day, &c."

2. The plaintiff examined J. C. Brown, who stated, that he surveyed township 45, range 7, in 1817–18, and run the out boundary of the Grand Prairie field lots. Witness stated, that there was in the Surveyor General's office an unofficial map, made by Soulard for his own use, purporting to be a map of the surveys in the Grand Prairie, which was believed to be correct. The southernmost lot laid down on this map was that of Kiercereaux, being the lot designated as survey No. 3304. This lot of Kiercereaux, was the fourth lot south of the one first extending eastwardly 9 arpens further than the lots north of them, and making the off set heretofore spoken of. By this map Brown was governed in his survey of the Grand Prairie common fields. He surveyed the land south of Kiercereaux, into sections as public land. In running the eastern out boundary line in 1818, he made the eastern line of Kiercereaux's lot, and of the three lots north of it, an extension of the eastern line of the northern block of lots; but in 1835, when he was employed to make a survey of the common field lots in the Grand Prairie, it was discovered that

Kiercereaux's lot and three others north of it extended further east, and he was directed to survey them accordingly. He was at the same time directed to survey the lots of Chancellier and Calve, south of Kiercereaux's, and he then surveyed the lots designated as surveys 1296, 1461, 3303, 3304, 1561 and 1583, as they are laid down on the certified plat given in evidence by defendant. These are the six lots in the off-set —and the two last are the Chancellier and Calve lots—both being out side of the out boundary line of the common fields of the Grand Prairie, as he had surveyed it in 1818. These surveys he made officially. He found stones on the east lines of surveys 1296, 1461, 3303 and 3304, but none further south. At the first survey in 1818, the front and rear lines of the four last mentioned lots corresponded with those north of them; at the second survey, he found stones at both ends as laid down in the map in evidence. He was not satisfied with surveys 1561 and 1583, but sufficiently so to return them. This witness stated, that there was a lot surveyed for Calve in the Cul de Sac common fields, which is much nearer to Little River (or Mill Creek) than the lot in Grand Prairie.— The southern branch of this stream crosses the survey in the Cul de Sac. He was of opinion that the Cul de Sac common fields had been erroneously located—that the eastern line as now run, being taken as the base, the survey should have gone east for quantity instead of west. If these fields had been so run, Calve's lot in Cul de Sac, would have touched Little River.

This survey of Brown of Calve's lot, was not approved until 1844 or 1845. The plaintiff also gave evidence tending to show that Calve resided in Florissant in 1792.

The plaintiff at the close of the testimony asked the following instructions which were refused:

1. That if the jury find from the evidence that the survey of the Calve claim given in evidence, is for land which was not and is not bounded by *Little River*, the survey professing to be made under the confirmation by the act of Congress of 1816, is erroneous.

That the confirmation of the report of Calve's claim as the report was made by the Recorder of land titles is to be located so as to be bounded on one side by *Little River*, and that a survey not so bounding it, is erroneous.

3. That the confirmation given in evidence by the defendant under the act of 1816, is no bar to plaintiff's action, unless the land granted in *Livre Terrien* No. 1, page 17, to Joseph Calve, covers the land in dispute.

12

4. That the land claimed to have been cultivated by Joseph Calve, was not confirmed to him or his heirs by the act of 13th June, 1812, unless the same was in a common field belonging to the town of St. Louis.

5. That the jury are to take the extent of the common fields of the Grand Prairie to be according to the surveys of the same as made by the Spanish Government, unless they find grants to have been made by the proper officers of that Government for common field lots, extending that field beyond the survey as made by Spanish authority.

6. That no land was confirmed to Joseph Calve or his representatives in the common field of the Grand Prairie by the act of 1812, if the jury find from the evidence that said Calve removed from St. Louis to St. Ferdinand and made that his permanent domicil, and ceased to cultivate or claim any land in said common field.

7. That the mere cultivation of land contiguous to the common fields of the Grand Prairie, does not authorize the inference that the land so cultivated was a common field lot, without showing by some authoritative act of the Spanish Government that such land was recognized as a common field lot.

8. That if the jury find from the evidence, that Joseph Calve moved from St. Louis to St. Ferdinand and made that his permanent domicil, prior to the year 1796, and ceased to cultivate the land in question, and that neither he nor his representatives set up claim to the same before any of the authorities of the United States under any act of Congress, nor exercised any act of ownership over the same, until the sales shown by the deeds given in evidence, (by the defendant,) then the jury are to regard the claim as not confirmed by the act of 13th June, 1812.

9. Unless the jury believe from the evidence, that on the 13th of June, 1812, *Joseph Calve*, or his legal representatives, claimed a field lot in the Grand Prairie of St. Louis, which contains the land in question, and that the same lot was inhabited, cultivated or possessed prior to the 20th of December, 1803; the act of Congress of 13th June, 1812, does not confirm the land in question to Calve or his legal representatives.

10. The documents offered in evidence to prove a location of the tract of land under New Madrid certificate No. 145, and the survey thereof in the name of Martin Coontz or his legal representatives, if the jury believe the said documents genuine, do vest in said Martin Coontz or his legal representatives, a good title to the land so located, as against the United States.

11. And if the jury believe from the evidence that the land in question has been by regular acts of the proper officers of the United States

granted or appropriated to the plaintiff, or those under whom he claims, so as to vest a good title in him or them as against the United States, such title cannot be affected by the testimony given in this case, tending to show that Joseph Calve cultivated the land in question, or part thereof, prior to the 20th December, 1803.

The court gave the following:

"If the jurors shall believe from the evidence that Martin Coontz was the owner of the lands in lieu of which the New Madrid certificate (No. 145, and read in evidence) was issued, and that said lands were duly conveyed by said Coontz to James Tanner, and by him to McKnight and Brady, under whom the plaintiff claims title to the premises in question, and that the premises in the plaintiff's declaration mentioned, are the same or a part of the same located in the name of said Martin Coontz under the said certificate; and if the jurors shall also believe from the evidence, that the said premises in the plaintiff's declaration mentioned, are not included within any common field lot in the *Grand Prairie common fields of St. Louis*, which was inhabited, cultivated or possessed as private property prior to the 20th of December, 1803, and which was not reserved by any *act* of Congress of the United States, prior to the making of the said location under the said certificate, and if they shall also believe from the evidence, that the defendant at the time of the institution of this suit was in possession of the said premises, they will find the issue for the plaintiff, and assess his damages for the rents and profits of said premises from the time this suit was instituted to the present, and also the monthly value thereof." On the other hand, "if the jurors shall believe from the evidence that Joseph Calve or his legal representatives, prior to December 20, 1803, inhabited, cultivated or possessed a common field lot in the Grand Prairie common fields of St. Louis, and that the premises in question are a part of the same lot so cultivated or possessed by the said Calve or his legal representatives; or if the jurors shall believe from the evidence that the premises in the plaintiff's declaration mentioned are included in any lot or tract of land known as a common field lot in the Grand Prairie Common Fields of St. Louis, which was inhabited, cultivated or possessed as private property, prior to the 20th December, 1803, in either case, the plaintiff is not entitled to recover, and they will find the issue for the defendant."

"If the jury find from the evidence that for several years, prior to the 20th December, 1803, there were lots of one or more arpens front by forty deep, possessed and cultivated as common field lots in the Grand Prairie of St. Louis, adjoining those which were granted; that such lots were oc-

cupied and used in the same manner as the granted lots of the same description; then the lots so occupied, possessed, used and cultivated, are common field lots within the meaning of the act of Congress of 13th June, 1812, although there may have been no written grant or survey thereof by the authority of the Spanish Government.

"And if the jurors shall believe from the evidence that Joseph Calve in virtue of the grant made by St. Ange, under the authority of the Spanish Government inhabited, cultivated or possessed prior to December 20, 1803, a lot or parcel of land of which the premises in the plaintiff's declaration mentioned are a part; and if the jurors shall also believe that the claim of said Calve, under said grant, to said lot or tract of land, was confirmed to him or his legal representatives, they will find for the defendant.

"But the confirmation given in evidence by the defendant under the act of 1816, is no bar to the plaintiff's right to recover in this action, unless the land granted in Livre Terrien, No. 1, page 17, to Joseph Calve, covers the land in dispute.

"And the abstract from the report of the Recorder of land titles read in evidence, and confirmed by the act of Congress in April, 1816, is evidence that the lot thereby confirmed to Calve's representatives, was a lot in the Grand Prairie Common Fields of St. Louis, and which confirmation under the said act of Congress is a confirmation of title to the lot of two by forty arpens in the Grand Prairie Common Fields of St. Louis, as cultivated and possessed by said Calve or his legal representatives prior to the 20th of December, 1803.

"And if the jurors believe from the evidence, that Joseph Calve entered upon, cultivated and possessed a tract or parcel of land of two by forty arpens in the Grand Prairie, under and by virtue of the grant to him from the authority of the Spanish Government, and that said tract or parcel of land was confirmed to said Calve or his legal representatives, as so cultivated and possessed under said grant by said Calve or his legal representatives, the title to said tract or parcel of land was vested by the said act of confirmation in the said Calve's representatives, notwithstanding it may appear from the evidence that the said tract or parcel of land so confirmed is not bounded by Little River.

"And the survey made under the authority of the United States of the said tract or parcel of land confirmed to said Joseph Calve or his legal representatives, is evidence of the extent and boundaries of the said confirmation as against the claims of the plaintiff.

"Again, if the jurors believe from the evidence that the premises in

question are claimed by the plaintiff under the New Madrid certificate No. 145, and the location and survey thereunder, and if they shall also believe that the defendant claims the premises in question under a title adverse to the plaintiff's title acquired under the certificate, they will find the issue for the defendant, unless the jurors shall at the same time believe from the evidence that Martin Coontz, to whom the said certificate purports to have been granted, was the owner of the lands in lieu of which the said certificate was issued.

"And if the title to the premises in question was in any way affected or changed by making the said location and survey under the said certificate, such title vested under the said certificate in Martin Coontz, and not in James Tanner or McKnight & Brady, and the plaintiff cannot recover against the defendant in this action, without showing a conveyance or transfer of said premises from said Coontz or his legal representatives.

"Again, if the jurors from the evidence find that all the land possessed and held by the defendant within the survey made for Martin Coontz or his legal representatives, is included within the tract recommended for confirmation to Joseph Calve or his legal representatives, by the Recorder of land titles, in his said report confirmed by act of Congress in April, 1816, the plaintiff is not entitled to recover in this action.

"Nor has the plaintiff shown any title in himself to any lands within the survey made for Martin Coontz or his legal representatives, which was at the time of the said location embraced within any private claim or claims, although such private claims were not then surveyed.

"Nor has the plaintiff shown any title in himself to any lands, within the said survey made for Martin Coontz or his legal representatives, which at the time of the location of the said certificate, was within or constituted a part of one or more common field lots in the Grand Prairie Common Fields of St. Louis."

The opinion of the Circuit Court in relation to the title of the plaintiff, under Martin Coontz, has already been considered by this Court in the case of Page vs. Hill. The instructions given on that head were erroneous.

The title of the defendant is based upon two acts of Congress, the one passed on the 13th June, 1812, and the other on the 29th April, 1816. If either title be good, it is conceded that the plaintiff cannot recover.— There is some difficulty in undertaking to consider these two titles as distinct and separate, inasmuch as the act of 1816, in confirming the village lots reported to Congress by the recorder, only added another confirmation to the one which previously had been made by the act of 1812.—

Most of the questions decisive of the merits of this case are also obviously questions of fact, about which there is a great contrariety of proof in the record. I shall endeavor to avoid these in explaining the views entertained by the court upon the questions of law raised by the instructions.

If the lot in controversy was a common field lot in 1803, and was cultivated or possessed previously to that period by Calve, or his representatives, and *not abandoned*, the plaintiff cannot, under any circumstances, recover. These questions involve facts for the determination of a jury. What constitutes a common field lot, within the meaning of the act of 1812, must be determined by the Court. There can be no difficulty or doubt about the meaning of this term. The term itself as has been stated at the bar, is not derived from the former inhabitants of this country, nor used in any of the Spanish concessions or surveys. No lot was ever granted *eo nomine.* But the phrase has been used by the American settlers, and adopted by Congress in its laws, to designate tracts of ground of a peculiar shape, usually from one to three arpens in front by forty in depth, used by the occupants of the French villages for purposes of cultivation, and protected from the inroads of stock by a fence, which inclosed the commons and the village. The shape of the lot, its contiguity to others of a similar shape, and the purposes to which it was applied, constituted it a common field lot. There are several of these common fields in the vicinity of St. Louis—the Grand or Big Prairie—the Little Prairie—the Barrier des Noyes, and the Cul de Sac. Between each lot, in these common fields, a space of a few feet was left uncultivated for the purpose of designating the line of separation. A common field lot could not be confounded with a lot of any other character, or an ordinary tract of land. Its marks are so peculiar and distinctive as to render any mistake on this head impossible. No man I apprehend, ever asked for a concession of a tract of land, for the purposes of a farm, of the form and extent of a common field lot. It would be the most inconvenient shape imaginable for any such a purpose. It would be from about 70 to 210 yards wide to upwards of a mile and a half in length. A tract of land for farming purposes or for any other purpose than that to which common field lots were appropriated, would hardly be selected in this shape, at a period when it could be readily obtained in any quantity or form desired, and when its value was so little appreciated. Whether the lot in controversy answered this description, was a question for the determination of the jury.

It is however insisted by the plaintiff in error, and the fourth and sixth

instructions which were asked in that behalf at the trial, so declare the law to be, that a common field lot could only be such by some authoritative act of the Spanish authorities, and that therefore a *grant* from that government must be shown.   It is probably true, that no common field lot was ever cultivated or possessed as such under the Spanish Government, unless there was a concession and survey made by the authority of its officers.   The whole history of the progress of settlements in these French villages, so far as it has been developed in the cases which have come up to this Court, shows, that the villagers did not venture to take possession of lots, either for cultivation or inhabitation, without a formal permission from the Lieutenant Governor or the commandant of the post. These permissions, it is also probable, were most generally, if not always in writing and accompanied by a survey, made by an officer selected and authorized by the Government.   But the title of the claimants, under this government, does not depend upon the existence or proof of any such documents.   Congress did not think proper to require it.   In all probability, the fact that possession, inhabitation and cultivation could not exist under the former government without such previous permission from the authorities of that government, was known to the framers of the act of 1812, and constituted the prominent reason, for dispensing with any proof of this character, in order to make out a title under that act.   However this may be, the act requires no such proof—but confirms the title upon possession, inhabitation or cultivation alone, without regard to the legality of the origin of such title.

But it is said, that if the lot in controversy was a common field lot, and cultivated by Calve, his subsequent abandonment of it puts an end to all title under the act of 1812.   This abandonment is supposed to be made out by proving Calve's removal to Florissant in 1792 or '3; his ceasing to cultivate the lot afterwards, and his never at any subsequent period making any claim for the same before any of the authorities of the United States.   There can be no doubt, that the act of 1812 did not intend to confirm lots to those who had abandoned them, and who had, at the passage of the act, no claim to them.   Many of these lots, it is probable, had been occupied or cultivated by different persons, at different periods of time, and Congress did not design to give the lots to the original or first occupants, but to those who had been last in possession prior to the passage of the act, and whose claims were subsisting at the date of its passage. If there was no *claim* at the passage of the act, to a specified lot, there was nothing upon which the act could operate.   The act confirmed *claims* to village lots and common field lots, provided such claims were

based upon inhabitation and cultivation prior to 1803—both the claim and the inhabitation or cultivation were essential to a title under the act. But the act did not point out any specific mode by which the proprietor was to make known his claim. The mere fact of a removal to an adjacent village, and ceasing to cultivate the common fields, could not be regarded as an abandonment. All cultivation in these fields had ceased fifteen years or more previous to the passage of the act. Nor did Congress require that the claim should be presented to some officer or tribunal of the Federal Government. It is true, that this course was pursued by a large number of the villagers, as appears by the report of the Recorder, which was confirmed by the act of 1816. But long after the passage of this act, the Government still remained in ignorance of the locality of many of these claims, and the act of 1824 was passed mainly for the purpose of inducing the claimants to come forward and designate their lots, in order that they might be distinguished by the United States Surveyor from the public domain. But it has never been considered that this act of Congress was *obligatory* upon the claimants. If they thought proper to pursue the course to which Congress invited them, and procure documentary evidences of their titles under the act of 1812, it was undoubtedly a great convenience to them, as well as to the Government. But if they preferred to rely upon their capacity to establish a possession or inhabitation or cultivation, they could do so without forfeiting their titles. This results necessarily from the construction which was given to the act of 1812. It was held to be a grant *proprio vigore*, and any further *action* on the part of the Government or the claimants was but supererogatory, so far as title was concerned. The act of 1824 only enabled the claimants to procure from the government the evidences of title which had previously emanated. The mere *inaction* of the villager cannot therefore be considered as abandonment. Some act or conduct which would amount to a *disclaimer*, might with more propriety be so regarded. An abandonment, by the Spanish laws, was quitting the possession of property *with the intention* that it should no longer be the property of the possessor. This intention must of course be inferred from acts. In the case of Salle dit Lejoye vs. Primm, (3 Mo. R., 530) the ancestor of the plaintiff had left this country in 1792 for France. He left his wife and children in St. Louis, and after reaching France, he informed them by letter of his intention never to return. He was never heard from afterwards. This was certainly a clear case of abandonment, and was so considered by the court. But in that case, Salle left his wife and children in possession of the lot, and they were held entitled to the benefit of

the confirmation. In the present case, the plaintiff insists that the removal of Calve to Florissant, ceasing to cultivate the common field lot, and failing to make known his claim to some officer of the Federal Government, constituted an abandonment. But neither of these facts separately make out an abandonment, nor can all of them together have that effect. It could not be contended, with any plausibility, that the first two circumstances, the removing and ceasing to cultivate, constituted an abandonment; and the last, which would certainly be conclusive, if any such obligation had been imposed on the claimant by the act of 1812, is insufficient to make out the case, because of the failure of the Government to make such claim a condition of the grant. It was not error, therefore, in the Circuit Court to refuse the instructions asked on this head by the plaintiff.

If it were conceded that Calve had abandoned this lot, and therefore had no title under the act of 1812, could the plaintiff recover if the lot were proved to be a common field lot? Could a location under the act of 1815 be made on a common field or village lot? The act of 1812 undoubtedly reserved all the lots in the enumerated villages, either for the claimants or the public schools or the Government. If the lot in controversy fell within the last mentioned class, and was reserved for the use of the Government, it would seem that the Government might subsequently, either by act of Congress or patent, part with the title. But a location under the New Madrid act has been considered as constituting a grant of no validity from the United States, unless it be made in conformity to the provisions of that law. If the Supreme Court of the United States adhere to their opinion in the case of Stoddard vs. Chambers, it is not hard to conjecture what their opinion would be on the hypothesis stated. If a New Madrid location could not prevail agains' a Spanish claim, confirmed by the act of July 4th, 1836, it must be because such location, when made upon land reserved by the act of 1811, was of no validity whatsoever. In what respect would its validity be strengthened by locating it upon land expressly reserved by the act of 13th June, 1812 ?

I do not mean, however, to give any opinion on the part of the court on this question. It was barely alluded to at the bar, and its decision may not be essential now.

The only question upon the confirmation under the act of 1816, is a question of locality. The plaintiff contends that this locality must be ascertained by reference to the description of it given in the concessi. n —as the Recorder, in his confirmation, refers to that concession—and

that the controlling call in this concession is for Little River. It is therefore insisted that a common field lot, which does not on either side touch Little River, cannot be the one confirmed by the act of 1816.

In construing the recommendations of the Recorder, in connection with the act of 1816, which confirmed his reports, we must look to the powers of that officer, and especially to the provisions of the law under which he professed to act. The Recorder's recommendations were made in a tabular form, and neither they nor the act of Congress which afterwards sanctioned them, contained any of the minuteness of details customary in a formal grant. The Recorder professed to act under the act of 1812, when he investigated and reported upon the titles to village lots. No such power was *in terms* given to him by any provision of that law; but the Recorder, supposing that previous acts had fully invested him with this authority, did proceed very extensively into this investigation, and the result of his labors was, a tabular report, embracing several hundred lots, all of which were recommended for confirmation. This report in relation to village lots, is detached from the general report, and is entitled "*Confirmation of village claims under act of Congress of the 13th June, 1812.*" Now, this act of Congress confirmed village lots *solely* on the ground of inhabitation, cultivation, or possession, previous to the 20th December, 1803. Concessions or grants from the Spanish Government were not alluded to in the act and had nothing to do with the foundation of the claims. The Recorder had no authority for confirming, under this law, any lot, either village lot or out lot, because of a concession. He cannot therefore be presumed to have acted on concessions, but he must be supposed to have had in view cultivation, inhabitation and possession, which were the only requisites to a confirmation under the act. It is true, that the Recorder refers, perhaps in every instance, to a concession or order of survey; but this is only as a description of localities. The thing confirmed was not the concession, but the lot which the villager had inhabited or cultivated. The prominent and controlling feature of the confirmation is this inhabitation or cultivation. Accordingly, we do not find a single instance of a village lot reported by the Recorder in which he does not refer to the proof of inhabitation or cultivation. The law required them, and the Recorder acted on them, and on them alone.

A case occurs in which the description contained in the concession does not apply to the lot which the claimant cultivated or inhabited.— Which then is confirmed ? Can it be doubted that the lot confirmed by the Recorder is the lot which the claimant actually occupied ? It was

this lot which the Recorder was authorized to report for confirmation, and in the absence of any proof of intention on his part to overstep the limits of his authority, we will presume that such was not his intention. The only difficulty in such a case must be the proof of locality; but in determining, as a question of law, upon the value of such proof, we must not lose sight of the fact that possession or cultivation was the *prominent* feature of the grant.

The assertion of the Recorder that the lot recommended for confirmation was occupied or cultivated by the claimant, constitutes a material part of the description of the premises, and must be taken in connection with the metes and bounds given in the concession. .If there be a conflict between the two, the latter cannot control.

In the present case, the lot recommended for confirmation is described as a common field lot in the Big Prairie common fields, and as the same lot conceded by St. Ange to Calve in 1768, and recorded in *Livre Terrien* No. 2, page 17. The concession thus referred to described the lot also as in the Grand Prairie common fields, and also states that it lies between the widow Mareschal and Little River. Nothing is known or no information is given on the record as to the existence or residence of the widow Mareschal, but the lot in controversy does not touch Little river. There is evidence to show that the Grand Prairie common fields did not, in 1768, touch any part of Little river. If this be so, it is clear that Little river, although a *material* boundary, should be rejected.— The concession and confirmation must not fall because there is an impossible call in the concession. The lot granted or attempted to be granted by St. Ange was undoubtedly a common field lot, and therefore was in the common fields. The history of French settlements, as I have before observed, is decisive to show that no lot of two by forty arpens was ever granted in the Grand Prairie, as a tract of land disconnected with other tracts of a similar shape and independent of any contiguity to other common field lots. There may have been vacant strips in the common fields. I believe the maps show that there were—but this happened only where sink holes or other natural obstructions rendered such strips unfit for cultivation. The continuity of the common field lots was unbroken except by circumstances of this character, and they would produce but small gaps in a country like that around St. Louis, which, in 1768, must have been almost entirely a prairie. If it can be shown, then, that the lot which Calve actually cultivated under St. Ange's concession was not on Little river, and it .includes the premises in controversy, or that the Grand Prairie common fields did not touch Little river, the confirm-

ation of 1816 is a defence to this action. So that, in my opinion, the material question will be under either the act of 1812 or 1816, whether the land in controversy was in the Grand Prairie common fields and was cultivated by Calve prior to 1803. The concession of St. Ange is un-doubtedly evidence to show that the lot conceded was on Little river and in the Grand Prairie common fields. But if the defendant can establish that the Grand Prairie common fields did not extend to Little river, the call for that stream must be rejected.

The evidence in relation to the location of the *Cul de Sac* common fields cannot be conclusive upon the questions in controversy, unless it could also be shown that the *Cul de Sac* common fields were in the Grand Prairie, and not distinguished from the Grand Prairie common fields in 1768. It seemed to be the opinion of the witness, Brown, who was an experienced surveyor, that these common fields had been erroneously located, and that if they were properly located, Little river (or Mill creek) would cross them: But the Recorder and the concession of St. Ange both describe the lot of Calve as in the Grand Prairie common fields. The Recorder also took proof of cultivation, and confirmed the lot proved to have been cultivated. To make the Little river the controlling part of the description, and reject the call for the Grand Prairie, both in the concession and the confirmation, would only multiply difficulties. Still, it cannot be denied that the plaintiff may shew that a proper location of the *Cul de Sac* common fields would place them on Little river. But such evidence, if it went no further, would only weaken the strength of the defendant's evidence, which tends to fix the locality of Calve's cultivation on the land in controversy.