HARRISON, Respondent, *vs.* PAGE, Appellant.

1. Page *vs.* Scheibel, 11 Mo. Rep. 167, affirmed.
2. To establish that a lot was a common field lot, within the meaning of the act of 1812, it is not necessary to show that the village authorities under the Spanish government exercised any authority over it or its owner.
3. A common field lot was one of a series of lots in the vicinity of the village, occupied and cultivated by the inhabitants of the village in a common field.
4. That a lot was not embraced within a Spanish survey of the common fields, is slight, if any evidence, that it was not a common field lot.
5. Where a deed, describing the land conveyed by reference to a Spanish concession, was executed at a time when such concession had been located and confirmed by the United States government, and there is no call in the concession inconsistent with such location, the deed will be held to pass the land on which the concession has thus been located.

*Appeal from St. Louis Court of Common Pleas.*

This was an action of ejectment, brought by Harrison in the St. Louis Court of Common Pleas, on the 29th of August, 1848, against Francis W. Page, for two by forty arpens of land, lying in the Grand Prairie, about three miles from St. Louis. It was tried in October, 1850, and resulted in a verdict and judgment for the plaintiff, for some two or three acres of the eastern end of said tract.

The plaintiff's title was a confirmation, by the recorder of land titles, to Chancillier's representatives, referring to livre terrien, No. 1, page 9, for the warrant or order of survey. He gave in evidence the survey of this confirmation by the United States, numbered 1561; also, the survey by Duralde of lots of Picard, and of Mainville *dit* Dechesne, in the same range of common fields, a little further north, taken from livre terrien, No. 2. The Picard and Mainville lots were side by side, and in describing them, Duralde says as follows: In the Picard lot, " et tient immêdiatement d'un coté à celle de Joseph Tayon, et de l'autre en partie au domaine du roi, et en partie à celle du Sieur Dechesne, *celle-ci,* étant plus avancée vers l'est de neuf arpents trente six pieds," &c ; and in Mainville *dit* Dechesne's lot, "est situê et tient immêdiatement d'un cotê à celle du nommê Routier et de l'autre en partie au do-

maine du roi, et partie á celle du nommé Picard, *celle-ci* étant plus avancée vers l'ouest de neuf arpents, trente six pieds,'' &c.

The plaintiff also gave in evidence a judicial sale of the property of Chancillier, wherein it appears that a half arpent of land in the Grand Prairie was sold to Louisa Dechamp, widow of Chancillier ; also, deeds as follows :

5th of April, 1834. Alexis Chancillier and Louis Chancillier to Matthew R. Boyce—$\frac{1}{2}$ by 40 arpens, residue of 2 by 40 arpens granted to Chancillier in Grand Prairie, in livre terrien. The grantors say they are grandsons of Chancillier.

26th of June, 1835. Strother and wife and Lawless to said Boyce—$\frac{1}{2}$ arpent by 40 in Grand Prairie.

12th of September, 1828. Marie Louise Laroque, widow of Basil Laroque, to George F. Strother—all her right in all the property of her first husband, Chancillier, and $\frac{1}{2}$ arpent by 40.

12th of May, 1834. Josephine Chancillier and Genevieve Chancillier to said Boyce—same description as in the deed of Alexis and Louis. They say they are grand-daughters of Chancillier.

25th of August, 1836. Gabriel Marlow and Julia his wife, to said Boyce, (said Julia being a grand-daughter, as she says.) Same description.

9th of May, 1847. Hypolite Bernard and Marie Therese his wife, to Boyce—2 by 40 arpens in Grand Prairie, bounded south by Calvè and north by Kiercereau.

21st of August, 1847. Charles F. Lefaivre and Cecile his wife, to Willis L. Williams—their interest in 2 by 40 arpens, granted to Chancillier ; livre terrien, No. 1, page 9, and being survey 1561.

10th of May, 1848. Matthew Boyce to Williams—a part of said 2 by 40 arpens, survey 1561—eastern part, containing about *seven* arpens.

10th of May, 1848. Williams and wife to Harrison—same as in the last deed, seven arpens.

According to the survey of the United States, of the Chancillier field lot of 2 by 40 arpens, its eastern end was on a

line with the surveys of the adjacent common field lots, at the north, till reaching the division line between the lots of Picard and of Mainville, and there, is an offset of nine arpens and thirty-six feet to the west, so that from that point, the base or eastern line of those common field lots in the Grand Prairie, going towards the north, is 9 arpens 36 feet further west than the eastern line of the common fields south of that point. The defendant contended, that the field lots, south of the Picard tract, were improperly located and surveyed so far towards the east; and that by the true reading and construction of Duvalde's surveys, the offset should not have been so made, as to bring down the field lots, comprehending Chancillier, 9 arpens 36 feet further to the east than the base line of the Picard lot, and the other lots north of it. According to the location contended for by the defendant, the Chancillier tract would not interfere with the defendant's land ; but, by its location so far to the east, its eastern end interfered with defendant's possession and enclosure, some two or three acres.

There was evidence given by plaintiff, tending to prove, that the location made by the United States survey was correct ; and, on the other side, the defendants gave evidence, tending to prove, that the said concession to Chancillier was at another place, and nearly half a mile further north, in said range of common fields ; and that the offset of 9 arpens and 36 feet should not have been so made, as to bring down the common field lots south of Picard, that distance further east than the eastern line of the Picard lot and the lots to the north of it.

The following instructions, asked by the plaintiff, were given by the court :

1. If the jury find, that for several years prior to the 20th of December, 1803, there were lots of one or more arpens front by 40 in depth, possessed and cultivated as common field lots, in the Grand Prairie of St. Louis, adjoining those which were granted, and that such lots were occupied, possessed, used or cultivated, in the same manner as the granted lots of the same description, then the lots so occupied, possessed, used and

cultivated, are common field lots, within the meaning of the act of congress of the 13th of June, 1812, although there may have been no written grant, or official survey thereof by the Spanish government.

2. If the jury find that Chancelier, or his representatives, claimed such a lot of 2 by 40 arpens, in the Grande Prairie, and possessed or cultivated the same prior to the 20th of December, 1803, then the same was confirmed by the act of the 13th of June, 1812, unless the same was abandoned by said Chancelier, or his representatives.

3. The confirmation to Chancelier's representatives, given in evidence, is a confirmation of the title to 2 by 40 arpens in the Grande Prairie common fields, as cultivated and possessed by Chancelier, or his representatives, prior to the 20th of December, 1803, and the survey No. 1561, is evidence of the extent and boundaries of said confirmation.

4. If the jury find from the evidence, that Chancelier, or his representatives, mentioned in the report of the recorder, possessed or cultivated a lot or parcel of land of 2 by 40 arpens, in the Grande Prairie common fields, prior to the 20th of December, 1803, the title to said land was vested in Chancelier's representatives, notwithstanding it may appear that it does not correspond with the description of the concession referred to by the recorder of land titles, in his report, given in evidence.

5. If the land in controversy is within the boundaries of the confirmation to Chancelier's representatives, then Martin Coontz and his representatives acquired no title thereto, by virtue of the New Madrid certificate, location and survey, and other documents given in evidence by the defendants.

In addition to the above, the court, of its own motion, gave the following :

1. A common field lot, within the meaning of the act of June 13th, 1812, is a lot in the neighborhood of one of the villages or towns enumerated in said act, used by an inhabitant of said town or village for purposes of cultivation ; said common

field lots being in the form of parallelograms, usually from 1 to 3 arpens in front by 40 in depth, lying adjacent to each other, in the same general ranges of lots, all in the same range being protected by a common fence in front, and each of them separated from that adjoining, by a small strip of land a few feet in width, left uncultivated, so as to mark its limit or boundary, and the division lines between the respective lots of said cultivators.

2. The United States survey, No. 1561, offered in evidence by the plaintiff, is *prima facie* evidence of the extent and correctness of the boundaries of the lot confirmed to Louis Chancelier, or his legal representatives, and should be received as correct, unless the defendant has proved to the satisfaction of the jury, that it is erroneous.

3. If the eastern line of the United States surveys, Nos. 1296, 1461, 3303 and 3304, conforms to the eastern boundary of the same lots, as surveyed by authority of the Spanish government, and the land confirmed to Louis Chancelier, or his legal representatives, is 2 by 40 arpens, lying adjoining and south of the United States survey No. 3304, the jury should consider that fact as corroborative of the correctness of said United States survey No. 1561.

4. If the jury believe from the evidence, that the land in controversy in this suit, is within the boundaries of the tract or lot of 2 by 40 arpens, in the Grande Prairie common fields, confirmed to Louis Chancelier, or his legal representatives, and that said Chancelier had a grant or concession from the Spanish government, of only one such lot in said common fields, and that the confirmation of said lot by the act of 1816, given in evidence, refers to said concession or grant, recorded in Livre Terrien, as the lot confirmed, and said concession or grant locates the said lot in the Grande Prairie west of St. Louis, then the descriptions in the deeds of Marie Louise Deschamps, Alexis Chancelier, and Louis Chancelier, Joséphine and Geneviève Chancelier, and of Gabriel Marlow and wife, are sufficient to pass the title of said grantors to the lot in the Grande Prairie

common field, confirmed to said Chancelier, or his representatives, and sued for in this action.

5. If the jury find from the evidence, that the United States survey No. 1561, is incorrect, and that the eastern boundary line of the common field lots in the Grande Prairie common fields, lying south of the Picard lot, ought not to be located so as to extend further east than the eastern line of said Picard common field lot, and others north of it, and that the 2 by 40 arpens, embraced in survey No. 1561, is one of the Grande Prairie common field lots, they will find for the defendant.

The following instructions, asked by the defendant, were refused by the court:

1. If the jury find from the evidence, that the grant or concession to Louis Chancelier, dated 20th January, A. D. 1767, given in evidence by the plaintiff, does not include any land which was in the possession of the defendant, at the commencement of this suit, they are then instructed, that there can be no recovery in this action, for any interest conveyed by the deeds of Marie Louise Deschamps, Alexis Chancelier, Louis Chancelier, Josephine Chancelier, Geneviève Chancelier, Gabriel Marlow and wife; if the jury believe from the evidence that the grant referred to in said deeds, is the said concession to Chancelier.

2. If the jury find from the evidence, that said concession to Louis Chancelier, given in evidence by the defendant, does not include any land in possession of defendant, at the commencement of this action, and sued for in the same, and that the land so sued for, is no part of an outlot or common field lot belonging to the old town of St. Louis, they will find for the defendant.

3. That in order to constitute the 2 by 40 arpens, included in survey 1561, *an out lot or common field lot*, within the meaning of the act of congress, approved 13th of June, 1812, entitled " an act making further provisions for settling the claims to land in the territory of Missouri, " said tract must have been recognized as such under the Spanish government, and must have been appurtenant to the village of St. Louis

then, in such wise, as to be subject to the authorities of said village, in the same manner as those lots were, which were, without dispute, common field lots, belonging to said village.

4. That if the jury find from the evidence, that the land included in said survey 1561, was not included in the official surveys of the range of common fields in the Grande Prairie, under the Spanish government, and there were several other ranges of common field lots belonging to St. Louis then, and that all of them were surveyed under that government, and a record of such surveys was preserved, and still remains among the archives of the country ; and if they further find, *that there was* no authority or control exercised over said tract by the town of St. Louis, or its officers, they are then bound to consider said tract, as not being an out lot or common field lot, embraced in the provisions of said act of congress of 13th of June, 1812, and as not confirmed by that act.

5. That if the jury find from the evidence, that the eastern boundary line of the common field lots in Grande Prairie common fields, lying south of the Picard lot, ought not to be located so as to extend further east than the eastern line of the said Picard field lot, and others to the north of it, and that the 2 by 40 arpens embraced in survey 1561, is one of the Grande Prairie common field lots, they will then find for the defendant.

6. That the survey by the United States, numbered 1561, given in evidence in this case, is merely *prima facie* evidence of the location of the claim, of which it purports to be the survey, and if the jury believe from all the evidence in the case, that said claim should have been located differently, or elsewhere, they are bound so to find.

*Spalding and Shepley,* for appellant.

I. The first instruction, asked on behalf of the defendant, ought to have been given.

1. The deeds referred to in that instruction, convey only what was embraced in the grant or concession to Chancelier which was given in evidence.

2. That concession, if it did not embrace the land pos-

sessed by the defendant, cannot be enlarged by the evidence or by a subsequent independent grant, so as to make the deeds embrace it.

3.   The concession, as originally made, may not have embraced the spot possessed by defendant; first, because if located at the right place, it may have been a half mile or more further north ; second, it may have been located too far east.

4.   The case of *Page* v. *Scheibel*, 11 Mo. Rep. 167, does not help out the defendant's objection to the deeds.   The question there was, what land was confirmed, but *here*, it is, *what land do these deeds describe ?*

5.   The deeds mentioned, convey the land embraced in the concession to Chancelier, given in evidence, made in 1767, and there is no other description.   The plaintiff alleges, that that land is included in survey No. 1561.   The defendants allege, that the land embraced in that concession, was far north of that place.   Will land pass by a deed which describes a tract in another and different place ?

6.   The confirmation was on possession prior to the 20th of December, 1803, and in the confirmation, the recorder refers to said concession.   What proof of possession he had, is not known nor where it was.   But the land surveyed, No. 1561, has not the boundaries called for in the concession, nor, on the trial, was there any proof of them at that place where the survey was made.

7.   The question, as to where the concession made was actually situated, and whether it included the possession of the defendant below, is left to the jury by this instruction, and this was right.   For, 1st, the recorder does not say it was next to Kiercereau ; but only says that it was confirmed on *posses-sion* prior to 1803, and where was that possession?   The surveyor does, indeed, locate it there, but a survey is only *prima facie* evidence.   *Page* v. *Scheibel*, 11 Mo. Rep. 167. *Eberle* v. *Public Schools*, 11 Mo. Rep. 247; 2d, the Spanish survey of it, even if it were proved to have been there,

would not have altered the case. 4 How. 447–8, *Mackay* et al., v. *Dillon*. 4 How. 449, *Les Bois* v. *Bramell*.

II.   The defendant's second instruction ought to have been given. The court should have told the jury that, if the land possessed by the defendant was no part of a common field or out-lot, it was not confirmed by the act of 1812, and tha if the concession confirmed by the recorder did not include it, they could not find for the plaintiff.

1.   This is different from *Page* v. *Scheibel*. That had an impossible call ; it was in Grande Prairie and on *Little River*, and it could not be *both*. The recorder passed upon it, as having been in the Grande Prairie, and as having been possessed.

2.   In the Scheibel case, the court says, that the concession describes the land ; it is the same as if the recorder said, in so many words, *I confirm the land embraced in that concession*. If it describes land in another place, and the jury so find it, there could be no recovery.

3.   The recorder does not recognize possession under this concession, at the particular spot where the plaintiff below claims.

III.   The third of the defendant's instructions ought to have been given. It merely defines what an *out-lot* or *common field lot is*, and defines it correctly ; and it is pertinent, because the plaintiff below proved actual cultivation, and claimed the ground as a *common field* or out-lot. 11 Mo. Rep. 264–5–6. 12 Peters, 442–3–4–5, 450.

IV.   The fourth instruction was on the same point, and is *law*, and should have been given.

V.   The fifth instruction asked by the defendant should have been given. It depends entirely upon an arithmetical calculation. The east line of the Picard field lot, is west of the eastern line of the Chancelier lot, as located by survey 1561, nine arpens, thirty-six feet ; that is, 1771 feet English. Now, if this survey were pushed west that distance, or half of it even, it is mathematically certain, that it would not have interfered with the defendant's possession. 9 Mo. Rep. 603.

VI. The sixth instruction asked by the defendant, should have been given. It merely leaves the question of location to the jury, and there was testimony on behalf of the defendant, tending to prove it elsewhere.

There was evidence impeaching survey 1561, viz :

1. René Paul's construction of Duralde's survey.

2. Conclusion of Duralde's survey of Langlois, Routier and Kiercereau, given in evidence by the plaintiff ; "*celui-ci*" there, refers to the page then *using or being used*.

3. Brown's survey of out boundary of Grande Prairie common fields *approved*, and standing for twenty years in the land office, followed by Paul's.

4. The calls of the Mackay tract, Chatillon and others at the west end, showing that these lots must have extended further west than they are now surveyed.

5. The Chauvin or Tayon concession of forty by forty arpens, connected with Evans' testimony, tends to show that there were no common fields there.

6. The location of the Chancelier concession by survey 1561, is not sustained by Duralde, and it is not matter of law, that the stone found by Cozzens was put there by the Spaniards.

7. The concession to Chancelier was *confirmed*, and this confirmation is surveyed in survey 1561 ; but said *concession* and *confirmation* did not lie at that spot. See the concessions to Chancelier, Hervieux, Laclède, Condé, Bacanné.

*E. Bates*, for the same.

I. In so far as the plaintiff claims by a Spanish concession or grant, his location must conform to the governing calls of the grant. For, as the surveyor is not a judge of title, and has nothing to do with it, his only function is, to mark and identify the position, boundaries and extent of the land, as *granted and confirmed*. If he find the true position occupied by a previous survey, still he cannot give other land in another place ; he must survey the confirmed grant, without reference to any conflict of title, or claim, with other persons.

II. The only call of Chancelier's grant is Hervie u x and the only call of Hervieux's grant is Chancelier (except the indefinite calls for the king's domain at the ends of the tract.) Each calls to be bounded by the other on *one side*. Which side is not stated, but it is beyond dispute, that, in so far as they claim by grant and written confirmation, the surveyor must place them side by side, or refuse to locate them at all, for the papers give no other indices of locality.

III. Here, Chancelier's lot is arbitrarily placed between René Kiercereau and Calvé's surveys, to neither of which has it any paper reference, but the contrary. For the recorder, on the face of the confirmation, refers to the concession, which calls for Hervieux as the only specified boundary.

If it be said that the surveyor placed it there upon information of witnesses, examined on the spot, I have two answers :

1. He has no right to hold such an inquisition, whereby the terms of the grant are falsified, and the rights of others put in jeopardy by his *ex parte* proceedings—he must survey the land according to the descriptive list which the recorder is required to furnish.

2. He was not surveying a *possession*, or a lot whose title originated in possession, but a *confirmed grant*, in which the quantity and some of the metes and bounds are set forth. His information obtained from witnesses in the field, could not have been of the grant or confirmation, but only of possession or cultivation.

IV. As to possession, certainly if, at the date of the act of 1812, a man had any " right, title or claim " to a " town lot, out-lot or common field lot," his right, title or claim was confirmed *by that act*, provided he had " inhabited, cultivated or possessed " said lot prior to the change of government, but not otherwise. The thing he claimed must have been a *lot*, recognized as such, in Spanish times, and with extent and boundaries capable of proof, (as was required by the act of 1824.)

If he had a right to a lot at one place by grant, and pos-

sessed and cultivated ground at another place, the possession is not under the grant, and these two grounds of title, under two different acts of congress, cannot be united to aid each other, as is attempted here—the one to show a confirmation by the act of 1812, and the other to show its extent and its character as a common field lot.

A confirmation by the act of 1816, (evidenced, as in this record, by the tabular statement from the report of the recorder of land titles,) is by the mere force of the act, and is wholly independent of possession, or any other merits in the claimant.

This point is settled in *Hammond* v. *The Public Schools*, 8 Mo. Rep. 65. That case will show that Madame Lacaisse never did inhabit, cultivate or possess the lot, yet it was hers, by mere force of the act, and without any action or merit on her part.

V. In confirmations of *lots* by the act of 1812, it is conceded on all hands, that they must have been designated and known *as lots* in Spanish times. And I admit, that if a man had a *grant* or *survey* of such a lot, and used a part of it, claiming the whole, his claim to the lot, as described in the grant or survey, is confirmed by the act.

But if a man have no other title than cultivation or possession of a piece of ground contiguous to granted and surveyed lots, I deny that the act confirms to him a lot like those granted and surveyed, in size, shape or boundary. I deny that it confirms to him an inch of land, beyond his actual possession.

The Spanish government knew nothing of a common field lot where Chancelier's claim is now surveyed; and the American government never heard of it until very lately. The *Grande Prairie* was one thing, and the *common field of the Grande Prairie* was another—a small part of the former. That common field was known to both governments. Its out boundaries were surveyed by Soulard, and afterwards, in 1817 or 1818, by Brown, which survey was recognized and adopted by the surveyor general in 1822.

VI. The entire common fields of the Grande Prairie, being well known to both the Spanish and American governments, they having both surveyed its out boundaries and put them on record, and Chancelier's claim not being embraced within that out boundary, it is plain, that whether Chancelier had, or had not, a lot at the place indicated, that place was not within the common field of the Grande Prairie. This court has decided, that what is a *common field lot*, is a question of law for the court; and, *a fortiori*, what is a *common field*, is a question of law. And here the point is settled by both governments —that is, the *common field* which they, by formal survey, have ascertained and declared as such.

Now, Chancelier's concession is older than Duralde's survey, (*Livre Terrien*, No. 2,) and yet is not embraced *by name* in that survey; and the reason is plain: the caption and concluding certificate of that survey showed, that the then government did not recognize the authority of St. Ange and Labuxière, to make the concessions, but did recognize the justice of the claim of the claimants and possessors; and that accordingly, Duralde made the surveys according to the then present rights of the parties, regarding the sales and exchanges that had been made subsequent to the grants.

One of two things, then, must be true; either that Chancelier's grant was abandoned by non-claim and left out of the survey, like Labuxière's grant in the St. Louis Prairie, (see *Hill & Thomas* v. *Wright*, 3 Mo. Rep. 243,) or, it was surveyed by Duralde, in some other name, as having been sold or exchanged.

The survey of the out boundary of the *Grande Prairie* field is a public survey, and, therefore, less subject than private surveys are, to objections by private persons.

VII. The survey of Chancelier is, at best, a mere private survey, and no better than any private survey with which it conflicts. It was placed where it is, not by any reference to the grant or confirmation, but in pursuance of some oral testimony of cultivation, taken by the surveyor, on the ground,

and that cultivation not made by or for the grantee, but by his son, nearly or quite thirty years after the date of the grant. That cultivation might have been the foundation of a claim by young Chancelier to a confirmation under the act of 1812, to the extent of his actual possession ; but, certainly, has no connexion, shown in the record, with his father's grant, nor could it perform the miracle of changing the little spot he cultivated, into a *common field* lot, of two by forty arpens, when no such lot existed there before.

VIII. The survey of the out boundary of the Grande Prairie common field, made by the surveyor general's office here, did but follow the Spanish survey of the same. It was made by our government, to enable it to ascertain and subdivide the public lands, in order that they might be disposed of according to law, whether by sale or by application to beneficent objects. And immediately afterwards, all the land, not covered by New Madrid locations, was subdivided, and the sixteenth section remained for the use of township forty-five, and is only interfered with by these new made common field lots—Chancelier's and others.

IX. To show, further, that the Spanish government never granted a common field lot, or knowingly allowed one to exist at the place where Chancelier's survey is now made, the defendant below gave in evidence the grants to Chauvin and Tayon, for forty by forty arpens (1600 arpens.)

These two tracts cover the same identical land : Chauvin's grant was in 1785, Tayon's in 1786. Tayon's was afterwards renounced and equivalent lands granted to him elsewhere. Chauvin's was confirmed by the board of commissioners, in 1811.

X. I need not dwell here upon what has been advanced by other counsel, that the lots granted to Chancelier and Hervieux were a half mile or more north of this survey, and that this fact is proved beyond question, by tracing upon the township plat, the call of the documents of title given in evidence.

But if the survey must be south of Renè Kiercereau, out-

side of the common field, as surveyed, and within the grant to Chauvin, still, it is insisted, it is too far east, by nine arpens and thirty-six feet.

XI. The counsel for the defendant in error contents himself with citing only the case of *Page* v. *Scheibel*, 11 Mo. Rep. 167, as covering this case and closing all way of escape for the defendants below.

I know not how far this court may be disposed to adopt the reasoning and the legal points assumed, *arguendo*, by the learned Judge who gave the opinion of the court in that case. But, with all possible respect, I must indulge the hope, that some important passages in that opinion will be taken by this court with many grains of allowance, when it is settling the titles of our most valuable lands, and laying down rules which others must apply, in order to measure the relative value of those titles, to show their origin, and define the elements of which they are composed. I refer, in particular, to page 186.

*F. M. Haight*, for same.

*H. S. Geyer*, for respondent.

The questions presented by the record in this case, with a single exception, were determined against the plaintiff in error, upon an elaborate argument and full consideration, in the case of *Page* v. *Scheibel*, 11 Mo. Rep.

In that case, D. D. Page was plaintiff below, claiming under a New Madrid location for Martin Coontz, or his legal representatives. The plaintiff in error, who is the son of D. D. Page, was the defendant below, claiming under the same title. In that case, Scheibel, the defendant below and in error, claimed under a confirmation of a lot of two by forty arpens in the Grande Prairie common fields, to Calvé or his legal representatives. In the case at bar, the plaintiff below, now defendant in error, claimed under a like confirmation of two by forty arpens in the same field, to Chancelier or his representatives.

Both Calvé and Chancelier had grants registered in Livre Terrien No. 1, the calls of which were not proved to embrace

the land in controversy. The report of the recorder of land titles, confirmed by the act of 29th of April, 1816, embraces both claims, referring in each of them to the grant, under the head " concession, warrant or order of survey." The quantity claimed, as stated in each case, is two by forty arpens in St. Louis fields, Big Prairie ; the acts of ownership, inhabitation, cultivation and possession, prior to 1803. Under the head " opinion of the recorder," in each case is stated, " confirmed to be surveyed." There was, in each case, an official survey by the United States ; that of Calvé being No. 3304, and that of Chancelier No. 1561. These surveys adjoin each other, No. 3304, being on the north. In both cases, the proof of cultivation and possession prior to the 20th of December, 1803, was very full and conclusive.

In respect to the title of Chancelier and his representatives under the confirmation, the same questions were made that have been decided in *Page* v. *Scheibel*, and upon the decision in that case, the defendant in error relies.

In no instance was a common field established by grant, or its boundaries defined by official authority. Grants of lots were made to individuals as they were required. Not as common field lots, for that name was unknown until after the lands had been cultivated under a common enclosure. The grants were made in tracts or lots of one or more arpens in front by forty in depth ; but the grants amounted only to permission to possess and cultivate and as a transfer of title. In some cases, there were spaces in the shape of the granted lots ; and in all of them, the common fields were extended from time to time, by the grant or cultivation of additional lots ; so that the only boundaries of the common fields, except along the front and rear of the lots, remained indeterminate, until the Governor ceased to make grants, and the inhabitants discontinued cultivation.

The act of the 13th of June, 1812, did not propose to confirm grants only, but to confirm the titles of those who had inhabited, cultivated or possessed a lot prior to the 20th of December, 1803. Permission to settle being presumed by that

act, inhabitation, cultivation or possession prior to 1803, is a title to the lot inhabited, cultivated or possessed.

The action of the recorder of land titles, confirmed by congress, is conclusive upon the United States and every person claiming under them, of the title of Chancelier's representatives to the lot in question, at least, until it shall be proved that the survey, No. 1561, does not include the land cultivated and possessed by Chancelier's representatives. Or, in other words, the report of the recorder and act of April, 1816, confers a complete title upon Chancelier's representatives, to a lot of two by forty arpens in the Grande Prairie ; that it was a common field lot, cultivated or possessed as such, prior to 20th of December, 1803, and the survey, No. 1561, being executed in conformity with the confirmation, is evidence of the location and boundaries, which can only be rebutted by proof that the cultivation was not of that lot. When the location was made of the New Madrid certificate, those who claimed to be the representatives of Coontz, knew, or are presumed to have known, that a lot of two by forty arpens to Chancelier's representatives, had been confirmed to be surveyed in the Grande Prairie, and that other confirmed lots were yet to be surveyed there. They knew also, that the surveys were to be made by the United States, and must adjoin the common field lots already surveyed on the north or south ; and, therefore, in making the location, they made it subject to future surveys of the confirmed lots.

But, independent of the action of the recorder and congress upon the title, the proof is full and entirely conclusive of the cultivation of a lot of two by forty arpens, precisely at the place where the survey was made, and there, the title is vested by the act of 1812, as well as by the report of the recorder and the act confirming it.

Chancelier and his representatives have, therefore, an unquestionable title to a lot of two by forty arpens, in the Grande Prairie, bounded on the north and south precisely as it appears to be bounded by the survey No. 1561, and it is wholly imma-

terial to the question of title under the confirmation, whether the boundaries correspond with the grant or not: it is the lot possessed and cultivated, and no other, that is confirmed—and if the lot granted is a different one from that cultivated, the lot granted is not confirmed. But it does not appear that the lot cultivated is not the same granted; all that can be said is, that the plaintiff did not prove the identity of the lot granted, with that confirmed; and the defendant gave no evidence to prove that it was not. It may or may not be the same lot; the calls in the grant are not inconsistent with the survey or cultivation,—and with the proof of cultivation, the confirmation by the recorder and the survey, it is presumed, in the absence of any evidence to the contrary, that the lot was cultivated under the grant, and consequently with the boundaries called for.

It appears that a number of the southern lots of the Grande Prairie, commencing with several north of Chancelier's No. 1561, extend nine arpens further east, than those further north; and it was contended, that the survey was erroneous on that account; but it will be seen, that some of the lots immediately north of Chancelier extended the full distance, under the Spanish government, and that by actual survey. The stones and cinders are found at the corners on the eastern boundary, as extended, and the survey No. 1561, conforms to that line.

The court below declared correctly, in holding, that if for several years prior to 20th December, 1803, there were lots of one or more arpens in front, by forty in depth, possessed and cultivated as common field lots, in the Grande Prairie, adjoining those which were granted, the possession and cultivation being in the same manner as of the granted lots, the lots so possessed and cultivated were common field lots within the meaning of the act of 13th June, 1812, although there may have been no written grant or official survey, under the Spanish government; and if Chancelier or his representatives possessed and cultivated such a lot prior to 20th of December, 1803, it was confirmed by the act of 13th of June,

1812, if not abandoned. This is the construction of the act repeatedly given by this court and by the Supreme Court of the United States, in the case of *Strother* v. *Lucas*, and is now too well settled to be disturbed.

In respect to the report of the recorder, confirmed by the act of 29th of April, 1816, the court below ruled, in conformity with the decisions of this court, that it is a confirmation of a lot of two by forty arpens, in the Grande Prairie common fields, as possessed and cultivated by Chancelier or his representatives prior to the 20th of December, 1803, and that the survey, No. 1561, is evidence of the extent and boundaries of the confirmation, and that the title to the lot so possessed and cultivated was vested in Chancelier's representatives, notwithstanding it might not correspond with the description in the concession.

That the representatives of Martin Coontz could not, by locating a New Madrid certificate, acquire a title to land previously confirmed to another, is the proposition asserted in the fifth instruction given for the plaintiff, and is too clearly according to law to admit of controversy.

All the facts upon which the title under the act of June, 1812, depended, were submitted to the jury, and found by them in favor of the plaintiff below, and that finding is upon evidence not only sufficient but conclusive. The accuracy of survey No. 1561 was submitted as a question of fact for the jury, by the last instruction given by the court on its own motion. That instruction is more favorable to the defendant than it ought to have been, and of that, the plaintiff in error cannot complain. The title under the act of June 13, 1812, is complete without a survey, and as a survey under the order of survey of the land confirmed by the recorder of land titles, it is conclusive against the plaintiff below.

It is unquestionable, that a New Madrid location, however regular, must yield to a title under the act of 1812. The legal title to a common field lot being vested on the 13th of June, 1812, depends upon inhabitation, &c., prior to the 20th of December, 1803 ; the title is according to the possession,

which, when proved, will prevail against a New Madrid location, or even a patent confirmation subsequent to the 13th of June, 1812. No survey of the confirmed lot is necessary, in order to maintain the title.

In respect to the confirmation by the recorder of land titles, the official survey must be regarded as conclusive against a New Madrid location. The party making the location, did so with full notice that the southern lots in the Grande Prairie fields, extended nine arpens east of the east line of the lots on the north, by the official surveys of the Spanish government; that a number of lots in the Grande Prairie, including that of Chancelier, had been confirmed to be surveyed; that the confirmations were upon possession, which possession was east of survey No. 3304, as has been fully proved at the trial; and if the defendant, or those who located the certificate, did not know the place of cultivation, it was because they did not take the trouble to enquire. They must have known that the lots on the south were extended as far east as the survey; and when the location was made, the order of survey existed, and its execution was intrusted to the officers of the United States, and the location was made subject to that survey, in the same way and with the same effect as when a location is made on a lot confirmed by the act of 1812, with the inhabitation, boundaries and extent remaining to be proved.

The remaining question arises from the descriptions in the deeds under which the plaintiff claimed.

In the deed from George F. Strother and Luke E. Lawless to M. R. Boyce, the land conveyed is described as a tract or piece of land situate in what is called the Grande Prairie, containing $\frac{1}{2}$ arpent in front by 40 in depth, being part of a larger tract originally granted to Louis Chancelier by the Spanish government.

The deed of Chancelier and others, heirs of Louis Chancelier, conveys to Boyce $1\frac{1}{2}$ arpens in front by 40 in depth, being the residue of 2 arpens by 40, granted by the Spanish government to Louis Chancelier. The said Chancelier

having, in his lifetime, conveyed $\frac{1}{2}$ arpent to one Gamache, the said land being situated in the Grande Prairie, west of St. Louis, and described as to boundary, in Livre Terrien, or Spanish records.

*W. L. Williams*, for same.

GAMBLE, Judge, delivered the opinion of the court.

1. In the case of *Page* v. *Scheibel*, 11 Mo. Rep. 167, the controversy was between Page, claiming under a New Madrid location, made in the name of Martin Coontz, or his legal representatives, and Scheibel, claiming a common field lot in the Grande Prairie common field. The claim to the common field lot was included in the report made to congress by the recorder of land titles, and was confirmed by act of congress of the 29th of April, 1816. The report of the recorder, which was in a tabular form, referred, in one column, to the provincial land book or Livre Terrien, for the concession of the land which had been made to Joseph Calvé, and in another column, stated that the lot had been cultivated prior to 1803. In one column it was stated, that there was no plat of the land, and in the last column, containing his opinion, are the words, "confirmed to be surveyed." The survey of the tract under this confirmation was made adjoining that now in controversy.

The present suit is between Page, claiming under the same New Madrid location, and Harrison, claiming under the confirmation of a common field lot made by the act of 1816, upon the same report of the recorder, in the same terms, in favor of Chancelier's representatives. In this, as in the other case, evidence was given to prove that the lot had been cultivated prior to 1803.

So far as the questions presented in the present case have been decided in *Page* v. *Scheibel*, they will not now be reconsidered, or the decision disturbed. The case was fully presented to the court and the decision given with care and deliberation ; and unless, under such circumstances, there was in the decision some error that we regarded as very manifest, we would not feel disposed to overrule it. If, in the argument or reasons employed by the Judge who gave the opinion, there

should be found parts which are open to objection, yet the conclusions of the court, upon the questions arising in the cause and decided, will not lose their force as authority, by a criticism of the argument, even if successful.

Before an examination of the questions in this cause, it is proper that the mind be, in some degree, possessed of a history of the titles under consideration.

The act of congress of the 13th of June, 1812, after confirming the rights, titles and claims of the inhabitants of the several Spanish towns and villages in Missouri to their town lots, out lots and common field lots, which had been inhabited, cultivated or possessed prior to the 20th of December, 1803, invested the recorder of land titles, by its 8th section, with the powers previously possessed by the commissioners, in relation to claims which had been filed and not decided upon by the commissioners, as well as claims by actual settlers, which the act allowed to be filed before him. His powers were, however, limited in the section, by denying him the right to confirm claims, and making his decisions subject to revision by congress. He was required to make a report to the commissioner of the general land office, of the claims, with the substance of the evidence in support of them, and with his opinion thereon, which was to be laid before congress.

The report made by the recorder upon claims, which, in his opinion, ought to be confirmed, had one column for reference to the concession, warrant or order of survey, another for reference to the survey, another for the name of the claimant, another for the quantity claimed, another for the situation of the property, another for acts of ownership over the property, and the last for the opinion of the recorder. In the case now before us, Livre Terrien, No. 1, page 9, is referred to for the concession; under the head of survey, it is stated, that the claim has not been platted; the claimants are Chancelier's representatives; the quantity, 2 by 40 arpens; situation, an out lot in the fields of the Big Prairie, St. Louis; the acts of ownership, possession and cultivation prior to 1803; and the

opinion of the recorder is, that the claim ought to be confirmed for 80 arpens, to be surveyed.

The claims thus reported, were confirmed, by the 2d section of the act of April 29, 1816.

At the period that the government acted on these claims, and confirmed that now under consideration, there was no opposing claim to the land now in controversy, and not only by the terms of the confirmation, but by the commands of the law governing the surveyor, it was his duty to survey the land embraced by the claim, as it was confirmed.

The survey of Coontz' New Madrid claim was not made until July, 1818.

If the land in controversy is properly included within the survey made under the confirmation, then the claimant under the New Madrid certificate, can have no title to it, for it is covered by a specific grant by congress, made before his title attached to it. Accordingly, the principal questions disputed in the court below and discussed here, relate to the proper location of the confirmation. It was denied, as a fact, that the common field extended as far south as this land, and if it did, that any of the lots projected to the east of its general boundary, so as to include the land in controversy. For the purpose of sustaining this view of the facts, it was insisted as a matter of law, "that in order to constitute an out lot or common field lot, the tract must have been recognized as such lot under the Spanish government, and must have been appurtenant to the village of St. Louis, so as to be subject to the authorities of the village, in the same manner as the others which were without dispute, common field lots." It was next insisted, " that if the land in controversy was not included in the official surveys of the range of common field lots of the Grande Prairie, under the Spanish government, and if there were Spanish surveys of the several ranges of the common field lots belonging to St. Louis, which were recorded and remained among the archives of the country, and if the town of St. Louis had not exercised control over the tract in question, then it was not

a common field lot, within the meaning of the act of June 13th, 1812."

2. It was held in *Page* v. *Scheibel*, that the titles of persons claiming common field lots, under the act of 1812, do not depend upon their being able to produce either concessions or surveys of the land claimed. The court says : " These permissions, (permissions to settle) it is probable, were most generally, if not always, in writing, and accompanied by a survey made by an officer selected and authorized by the government. But the title of the claimants under this government does not depend upon the existence or proof of any such documents."

If neither a concession or survey is a requisite to the title when confirmed by the act of congress, it is difficult to understand what other evidence of recognition, under the Spanish government, must be given by the claimant, in order to show that the land was a common field lot. It seems to be thought necessary that the confirmee should show that the lot was, in some manner, subject to the village authorities, in order to establish the fact, that it was a common field lot. If the syndics of the village would possess any authority over the lot, or its owner, by reason of its being a common field lot, certainly it is not necessary that the owner should give any evidence of the exercise of such authority, in order to establish the fact, that his property is of the description known as a common field lot.

3. Whether it is a lot of that description, or not, will be determined by its being one of a series of lots in the vicinity of the village, occupied and cultivated by the inhabitants of the village in a common field. The first instruction given by the court, upon its own motion, properly describes a common field lot, with two unimportant errors. In that instruction, it is mentioned, that the ranges of such lots were protected by a common fence in front, and that strips of uncultivated land were left between the cultivated lots, marking their boundaries. In the course of litigation, that has arisen in relation to this description of property, it has been shown that there were com-

mon fields which had no fence upon any of their lines ; and the strips of land left uncultivated between the different lots cultivated, were, by no means, generally found in such fields. In other respects, the description of such lots given in the instruction, is correct.

4. In determining whether the lot claimed by Chancelier was a common field lot, within the meaning of the act of June, 1812, too much importance was attempted to be given to Spanish surveys of the common fields. The evidence given in this case abundantly shows, that a tract of country was not made a common field under the Spanish government, by running an exterior boundary, and then subdividing the contents into lots, but the lots were granted or surveyed in succession, each being bounded on a lot previously granted, and so the common field was capable of indefinite extension, and each survey, when made, was the survey of a single lot. There could not be, under such circumstances, any survey of a boundary of the common field, which would show more than that, at the date of the survey, the lot granted had a certain extent, and as it would not be any limitation upon the power of the Lieutenant Governor to grant, so it would not afford any evidence that he had not subsequently granted lots or permitted them to be occupied. In fact, without being accompanied with some order directing such survey to be made, it is very questionable whether it would be any evidence against an individual claiming land which ought to have been embraced within it.

The fifth instruction given by the court, on its own motion, referred to the jury the question of fact, whether the lot confirmed to Chancelier's representatives was properly located by the United States survey, and directed them that, if they found that it ought not to have been projected to the east of the eastern line of the Picard lot, which was north of it, they should find for the defendant. This instruction substantially embraced the points contained in the fifth and sixth instructions asked by the defendant.

5. The questions presented upon some of the deeds under

which the plaintiff claimed, made by part of the representatives of Chancelier, who are named in the first instruction of the defendant, are not without difficulty. The grantors describe the land they conveyed as "1½ arpens, being 60 arpens, residue of 2 by 40 arpens, granted by the Spanish government to Louis Chancelier, the said Louis Chancelier having, in his lifetime, conveyed ½ arpent to one Gamache, the said land being situated in the Grande Prairie, west of the city of St. Louis, and described, as to boundaries, in the Livre Terrien, or Spanish record." Evidence was given for the purpose of showing that the tract granted to Chancelier in Livre Terrien, would not, if properly located, include that now in controversy. It appeared that the grant was made on the 20th of January, 1767, to Chancelier, for 2 by 40 arpens in the Grande Prairie, bounded on one side by Jean Hervieux, and on the other by——. The concession to Hervieux is dated 30th December, 1766, and is for 2 arpens by 40, bounded on one side by Louis Chancelier, and on the other by ——. These two lots had one line common to them, and there was no boundary called for on the other side of either; so that all that could be determined by their calls was, that they were to adjoin each other, but which is to the north or south of the other, does not appear. There did not appear to have been any Spanish survey locating these grants, nor any acts of the grantee, Chancelier, claiming to hold land under his grant, at any place other than that where the grant is now located. Three years after the date of the concession to Chancelier, a concession was made to Condé for a tract of 2 by 40 arpens, bounded on one side by Hervieux, and on the other by Deshêtres. There appears to have been no concession to Deshêtres. It is evident that the calls in Condé's concession do not assist in locating Chancelier, for the concession to Hervieux may be either north or south of Chancelier, and so, Condé's grant, calling for Hervieux, may just as well be answered, if Chancelier is at the south part of the common field, as if he were at the north. But, without stopping to examine the evidence in detail, it is sufficient to say

that, in the absence of any call in the grant that can fix its location, and without any survey fixing it at a place different from that now claimed, and without any claim set up under the grant at a different place, there is nothing to authorize a jury in finding that the grant was for different land.

On the other hand, the confirmation refers to the concession as contained in Livre Terrien, and declares that the land was cultivated prior to 1803, and this, in the absence of any calls in the grant that would separate it from the possession, must be understood as connecting the grant with the possession, and with all the authority of an act of congress, locating the grant upon the land cultivated and possessed prior to 1803. In *Page* v. *Scheibel*, it is distinctly asserted, that the confirmation of the claim, as reported by the recorder, is a confirmation of the title to the land possessed and cultivated, and that the statement of the possession and cultivation is the material and controlling description of the land embraced by the confirmation. The language of the court is, " The assertion of the recorder that the lot recommended for confirmation was occupied or cultivated by the claimant, constitutes a material part of the description of the premises, and must be taken in connection with the metes and bounds given in the concession. If there be a conflict between the two, the latter cannot control." In the present case, we have no call in the grant but the land of Hervieux, and the land of Hervieux is not located either by any calls in his grant, or by any survey, or by any acts of ownership under his grant. The grant, then, of Chancelier, was without any location, and without any calls that would interfere with its being located upon any land in the Grande Prairie common field, which he might have claimed and possessed under it.

After the act of congress was passed, which confirmed the claim and located the previously floating concession upon the land possessed and cultivated, the deeds were made by Chancelier's representatives, which are now considered as conveying other land than that confirmed, upon the supposition that the

concession was for other land. These deeds refer to Livre Terrien for the boundaries of the land conveyed, but being made at a time when the action of the government had located the concession upon the land possessed and cultivated, and there being no call in the concession inconsistent with such location, it must be understood that the grantors and grantees in the deeds were contracting about the land upon which the concession had been located ; and when we find the only concession in Livre Terrien, made to Chancelier, thus located, we have no difficulty in saying, that the deeds would pass the land on which the concession, by the consent of the government and the claimant, had been located.

Although the United States survey of the land confirmed was made after these deeds were executed, it will serve to show the understanding of the parties—both the government and the confirmees—of the meaning and operation of the confirmation. It purports to be a survey of a tract of 80 arpens, " situate in the Grande Prairie common fields of St. Louis, " and as " being the tract of 2 by 40 arpens granted to Louis Chancelier on the 20th of January, 1767, by Louis St. Ange de Bellerive, commandant of the post of St. Louis, in the Spanish province of Upper Louisiana, ( see Livre Terrien, No. 1, page 9, ) and confirmed to Chancelier's representatives by the second section of the act of congress, of the 29th of April, 1816, confirming all claims embraced in the report of the recorder of land titles, " &c. This survey is of the land possessed and cultivated, according to the testimony in the case, and it is apparent that it was made upon the understanding that the concession in Livre Terrien was located upon the same land.

The Court of Common Pleas properly refused the first instruction asked by defendant, which relates to these deeds, and although the fourth instruction, given by the court upon its own motion, is involved and rather confused, it contains all that was necessary to be said to the jury upon this question.

Upon the whole case, without any more detailed examination

of the points presented in the instructions, it is the opinion of the court, that there is no error requiring a reversal of the judgment of the court, and with the concurrence of the other Judges, it is affirmed.