JOSEPH GUITARD, FREDERICK STEUDEMAN AND MARY HIS WIFE, AND GEORGE BROWN AND JULIA HIS WIFE, PLAINTIFFS IN ERROR, *v.* HENRY STODDARD.

The act of Congress, passed on the 13th of June, 1812, (2 Stat. at Large, 748,) entitled An act for the settlement of land claims, in Missouri, confirmed the rights, titles, and claims to town or village lots, out lots, common field lots, and commons, in, adjoining, and belonging to the several towns and villages therein named (including St. Louis,) which lots had been inhabited, cultivated, or possessed, prior to the 20th of December, 1803.

This confirmation was absolute, depending only upon the facts of inhabitation, cultivation, or possession, prior to the day named. It was not necessary for the confirmee to have received from the Spanish government a grant or survey, or permission to cultivate the land.

In 1824 Congress passsed a supplementary act, (4 Stat. at Large, 65,) making it the duty of claimants of town and village lots to designate them by proving before the recorder the fact of inhabitation, the boundaries, &c., and directing the recorder to issue certificates thereof. But no forfeiture was imposed for non-compliance, nor did the government, by that act, impair the effect and operation of the act of 1812. Claimants may still establish, by parol evidence, the facts of inhabitation, &c.

In the act of 1812 the surveyor was directed to survey and mark the out boundary lines of the towns or villages, so as to include the out lots, common field lots. and commons. This was done. Whether a claimant can recover land lying outside of this line, or whether the evidence in this case is sufficient to establish the plaintiffs' title, this court does not now decide.

THIS case was brought up by writ of error, from the Circuit Court of the United States for the District of Missouri.

It was a petition in the nature of an ejectment brought by the plaintiffs in error, against Stoddard, in the St. Louis Court of Common Pleas. Stoddard, who was a citizen of Ohio, removed it into the Circuit Court of the United States.

The ejectment was for the following lot of ground lying in the city of St. Louis, namely, commencing at a point on the north side of Laclede avenue, five feet fifty-three inches east from the junction of Laclede and Leffingwell avenues, it being the south east corner of block No. 24, in what is known as the " Stoddard addition " to the city of St. Louis; runs thence north parallel to Leffingwell avenue one hundred and seventy-two feet six inches to a point; thence west along a line parallel to Laclede avenue one hundred and twenty-five feet to a point; thence south along a line parallel to Leffingwell avenue one hundred and seventy-two feet six inches to the line of Laclede avenue; thence east along that line one hundred and twenty-five feet to the beginning; it being part of block No. 24, in what is known as the Stoddard addition to St. Louis.

On the trial the jury, under the instructions of the court, found a verdict for the defendant. The bill of exceptions explains the whole nature of the case, and as it is short, it is here inserted, as follows:

Be it remembered that on the sixth day of May, 1853, came on the above entitled cause to be tried, when the plaintiff introduced the following parol evidence, to wit: That from a period long prior to the 20th December, 1803, to wit, from 1785 or 1786, to the period when the common fence fell down, which was six or seven years before the change of government, Paul Guitard, who was then an inhabitant of St. Louis, claimed and cultivated a piece of land in what was then known as the " Cul-de-sac" prairie, near St. Louis, which land was one arpent wide in front on the east, and forty arpens long towards the west. There were several persons who cultivated lands in the " Cul-de-sac" commencing on the south extreme of the prairie ; the first was Matard ; then going north the next was Guion ; the next or third was Tabean; the fourth Joachim Roy; the fifth Madame Vachard; the sixth Madame Dubriel; the seventh Madame Verdon; the eighth Noise; the ninth Yosti ; the tenth LaRochella; the eleventh Madame Camp ; the twelfth Paul Guitard. The " Cul-de-sac" fields laid at the end of the St. Louis prairie, forty arpent fields on the west, and they commenced about where Pratte avenue now is. The " Cul-de-sac" field of Madame Camp was the north land of that part of what is called Chouteau mill tract, west from the St. Louis prairie fields, and the north line of the Chouteau mill tract was the north line of Madame Camp's Cul-de-sac field ; and the same line was the south line of Paul Guitard's Cul-de-sac field. The " Cul-de sac," which meι s " end of a sac," was formed by the hills on each side north and south, and the hills on the west. The lands cultivated there were called lands of the " Cul-de-sac."

There were other prairies near St. Louis, to wit: The St. Louis or Big Mound prairie, the Grand prairie, and Barrier des Noyer prairie. In all of these the lands were cultivated in strips by different individuals, and they were all protected by the same' fence ; there was but one fence, which commenced at the half moon just north of the old Spanish town, ran thence west to a little beyond Third street, thence south-west to the fort a little south of the court house, thence westwardly around the St Louis and Cul-de-sac fields, to the east line of the Barrier des Noyer fields, thence south along that east line, and east around the St. Louis commons to the river. This fence was a common fence, and was kept up by those who cultivated the fields in the prairies, one cultivator making and mending part, and another another part, under the supervision and direction of a man who was called a syndic. This fence kept the cattle and stock inside the commons and away from the fields that were cultivated. The St. Louis prairie fields, the Grand prairie fields, the Barrier des Noyer prairie fields, and the Cul-de-sac prairie fields, were all

worked at the same time, until the common fence fell down and was neglected to be repaired, and Paul Guitard cultivated the land lying adjoining and north of the said Chouteau mill tract until the common fence fell down. His cultivation was towards the west on the hill, and he did not cultivate the land on the very eastern end, because it was rather low ground there. The cultivation of Guitard, starting from the hill, went west towards the middle of the piece of land; but how far it commenced from the eastern end, or how far it extended towards the west, was not proved. It was called Guitard's Cul-de-sac field from the west end of the St. Louis prairie fields to the west end of the Chouteau mill tract, which was the west line of the Cul-de-sac fields, now near the rock spring. The land sued for was proved to fall within one arpen in width, north of the Chouteau mill tract, and forty arpens in depth or length west from the St. Louis prairie fields; but whether it was a part of the very spot cultivated by Guitard was not proved. The plaintiffs introduced a deed from Paul Guitard which conveyed all his property and rights of property in St. Louis county, to his grandson, Vincent Guitard, but this specific claim was not mentioned; the deed was dated the 11th of January, 1822, and he died in 1823. Vincent Guitard died in 1836, leaving but three children, who are the plaintiffs and the sole representatives of their father. Vincent Guitard never in any way disposed of this land. Paul Guitard never had any concession for this land from the Spanish authorities; he never presented any claim he had to it under the act of 1812, to the recorder of land titles, nor made any claim for it before any board of commissioners. His grandson Vincent, nor none of the family, ever presented any claim to it before the recorder of land titles, under the act of the 26th of May, 1824, nor was the land ever surveyed either by the Spanish or American government, as a field lot. The defendant introduced a confirmation and patent, by virtue of the act of the 4th of July, 1836, to Mordecai Bell's representatives, and a survey of the United States which included the land in controversy and a regular chain of title to defendant. He also introduced map X, purporting to contain the out boundary lines of the surveyor-general, at St. Louis, projected under the first section of the act of the 13th of June, 1812, and it was proved that the land described in the declaration, but not the whole forty arpens claimed by plaintiff, lies within said out boundary lines. Plaintiff introduced an experienced surveyor, who stated that in his opinion the out boundary line, as projected on map X, was not correctly run under the act of 1812; that said out boundary line should have been run so as to include the out lots, common field lots, and commons, in, adjoining, and belong-

Guitard et al. *v.* Stoddard.

ing to St. Louis, which he thought it did not do. It did not include the Grand prairie fields or the Barrier des noyer fields, nor the Cul-de-sac fields, either as they purport to be located on the township plat of the township in which St. Louis lies, nor as proved in this suit, except about one third of their length as proved on the eastern end, nor does it include all of the commons of St. Louis; that in his opinion an out boundary line run under the act of 1812, so as to include the out lots, common field lots, and commons of St. Louis, would necessarily include the out lots, common field lots, in all the prairie fields as laid down on the township plat and commons. And such survey would also necessarily include land that was neither out lot, common field lot, or commons.

### Agreement.

It was agreed that in any court to which this action might be carried, map X and township plat, above alluded to, might be introduced and used without including them in this bill of exceptions.

It is also agreed that the property in dispute is worth more than two thousand dollars, exclusive of costs. This was all the evidence in the case, and thereupon the plaintiffs asked of the court the following instructions, namely:

*Plaintiff's instructions.* 1. The act of Congress of 13th June, 1812, is in its terms a grant, and confirms the right, title, and claim of all town lots or village lots, out lots and common field lots, in, adjoining, and belonging to such towns and villages as are mentioned in the act, to those inhabitants of the towns and villages or to their legal representatives who inhabited, cultivated, or possessed such lots, rightfully claiming them prior to the 20th December, 1803. And the principal deputy surveyor of the territory of Missouri was required by said act to run an out boundary of the towns and villages mentioned in said act, so as to include the out lots, common field lots, and commons thereto respectively belonging, which out boundary line should be one continuous line, and not separate surveys of the town and lots, and should include the out lots, common field lots, and commons, and said towns and villages.

2. A common field lot, as intended by said act of Congress, is a piece of land of larger or smaller dimensions, as the case may be, according to ancient cultivation, lying alongside of, and parallel to, other similar pieces of land, and claimed or cultivated under the protection of a common fence by those who inhabited said towns or villages prior to the 20th December, 1803; and said pieces of land might not have been conceded or surveyed by any French or Spanish authority, or surveyed officially by the United States as a common field lot.

42 *

3. If then the jury believe, from the evidence, that the land sued for formed part of a common field lot, as just defined in instruction 2, and that said common field lot was rightfully claimed, and in part or altogether cultivated prior to the 20th December, 1803, by Paul Guitard, the plaintiffs are entitled to recover; which were refused, to which plaintiffs at the time excepted, and defendant asked the following instructions:

*Defendant's instructions.* 1. If the jury believe, from the evidence, that the cultivation by Paul Guitard, testified to by the witnesses, was on a tract of land called a Cul-de-sac common field, and if the jury shall also believe, from the testimony, that the Cul-de-sac common fields, including the one cultivated by Paul Guitard, were at a place to the south-west from the premises sued for, and that neither of said Cul-de-sac common fields include the premises in question, then the plaintiff cannot recover in this action.

2. If the land sued for is within and forms a part of the tract confirmed to Mordecai Bell, or his legal representatives, and within the official survey of said Mordecai Bell tract, then the defendant has shown a title in him paramount to the title of the plaintiff, and the latter cannot recover.

3. There is no evidence that Paul Guitard, under whom the plaintiff derives and claims title to the premises in question, cultivated any out lot or common field lot, nor that any one existed at the place where the cultivation that has been spoken of by plaintiffs' witnesses, existed, nor had the act of 1812 application to this land, so far as Paul Guitard and those claiming under him are concerned. The plaintiff, therefore, cannot recover in this action.

4. If the out boundary line of the town of St. Louis run under the act of Congress of 13th June, 1812, as shown by the official survey and plat, marked X, read in evidence, includes the land in controversy, then the plaintiff cannot recover. Which were given by the court; and the court of its own motion gave the following:

*Instruction by the court.* " The court also instructed the jury, that there having been no concession nor grant, nor survey, nor permission to settle or cultivate, or possess the land claimed by Paul Guitard, to said Guitard, under and by the Spanish authorities or government; and no location of said claim by or under said government, nor under the French government, and no proof having been made at any time by said Paul Guitard, or those claiming under him, or any inhabitation, cultivation, or possession, or of the location and extent of said claim, either under the provisions of the act of the 13th June, 1812, or those of the act of the 26th May, 1824, either before the recorder of

land titles or other United States authority; and there having been no survey or location of said land by or under the authority of the United States, the said plaintiffs cannot now set up said claim and locate it, and prove its extent and inhabitation and cultivation by parol evidence merely, and therefore cannot recover in this action;" to which plaintiffs also excepted at the time, and here now tender this their bill of exceptions, and pray that it be signed and sealed and made part of the record in this cause; which is done accordingly.          R. W. WELLS. [SEAL.]

Upon this bill of exceptions, the case came up to this court, and was argued by *Mr. Williams* and *Mr. Geyer* for the plantiffs in error, and by *Mr. Johnson* for the defendant in error. Upon that side there was also a brief by *Mr. Ewing.*

The following notice of the points made on behalf of the plaintiff in error is taken from the brief of *Mr. Geyer:* —

It being admitted on the record that the premises in controversy were within the confirmation to Mordecai Bell, the instruction numbered two was decisive against the plaintiff, and the instruction numbered three decided the whole case in favor of the defendant. So that the additional instruction was wholly unnecessary to a decision of the cause. It furnishes, however, the construction given by the circuit court to the acts of 13th June, 1812, and 26th May, 1824, on which the decision against the title of the plaintiff is founded — a construction opposed to that uniformly given to the same acts, by the Supreme Court of Missouri, and presents to this cou﹞ a question upon the decision of which depend the titles to many lots of great value in and near the towns and villages named in those acts, and especially the now city of St. Louis.

On behalf of several persons interested in the question, but not parties to the record, I submit that the construction given by the Circuit Court to the acts before mentioned, is erroneous.

1. The first section of the act of 13th June, 1812, (Land Laws, vol. 1, p. 216,) is *proprio vigore,* a confirmation of the rights, titles, and claims to all town or village lots, out lots, common field lots, and commons, in or belonging to the towns and villages named, which had been inhabited, cultivated, or possessed, prior to the 20th December, 1803, to the inhabitants of said town and villages, according to their several right or rights in common thereto.

2. The act does not refer such claims to the recorder or any other tribunal for examination, report, or adjudication, nor does it require or contemplate the exhibition of such claim, or the proof of inhabitation, cultivation, or possession, before any officer or authority of the United States, for any purpose.

Guitard et.al. v. Stoddard.

3. No concession, grant, survey, permission to settle, or other documentary evidence of title, from the French or Spanish government, is necessary to maintain a title to any lot or commons under the act of 1812.; the confirmation is made by the act solely upon the inhabitation, cultivation, or possession prior to 20th December, 1803.

4. The legal title to the lots and commons, confirmed by the act of 13th June, 1812, became vested on that day in the inhabitants of the respective towns and villages, " according to their several right or rights in common thereto," leaving it to them to prove, orally or otherwise, the only facts required by the act of 1812, of inhabitation, cultivation, or possession, prior to the 20th December, 1803.

5. The act of the 26th May, 1824, (Land Laws, vol. 1. p. 397,) does not annex conditions to the confirmations by the first section of the act of 13th June, 1812; those who availed themselves of that act, and " designated their lots " by making the proof required, obtained a certificate, which served as *primâ facie* evidence of a confirmation, not by the recorder, but by the act of 1812. Those who failed to appear and designate their lots obtained no new evidence of title, but they did not forfeit that which was acquired twelve years before by the act of 1812.

REFERENCES. *Letters.* — C. B. Penrose, commissioner to secretary of the treasury; Thos. F. Riddick, secretary of commissioners to the chairman of the committee of public lands, H. R.; Gales and Seaton's State Papers, Public Lands, vol. 2, pp. 448, 451.

*Acts of Congress.* — Land Laws, vol. 1, Senate editi n, 1838; 2d March, 1805, c. 74, p. 122; 28th February, 1806, c. 79, p. 132; 21st April, 1806, c. 84, 138; 2d March, 1807, c. 91, p. 153; 13th June, 1812, c. 140, p. 216; 2d March, 1813, c. 153, p. 230.; 12th April, 1814, c. 162, p. 242; 29th April, 1816, c. 197, p. 280; 26th May, 1824, c. 311, p. 397; 27th January, 1831, c. 406, p. 478; 4th July, 1836, c. 505, p. 557.

*Cases.* — Foster v. Elam, 2 Peters, 253; United States v. Percheman, 7 Peters, 51; Strother v. Lucas, 12 Peters, 410. Vasseur v. Benton, 1 Mo. R. 212; Lajoye v. Primm, 3 Mo. R. 368; Janis v. Gurno, 4 Ib. 458; Gurno v. Janis, 6 Ib. 330; Trotter v. St. Louis Public Schools, 9 Ib. 69; Biehler et al. v. Coonce, Ib. 347; Machlot v. Dubrueil, Ib. 477; Montgomery & Co. v. Landusky, Ib. 705; Page v. Scheibel, 11 Mo. R. 167; Harrison v. Page, 16 Ib. 182; Kissell v. St. Louis Public Schools, Ib. 553; Gamache v. Piquignot, 17 Ib. 310; Soulard v. Clarke, MSS.

The act of 13th June, 1812, is the first in which the village claims are mentioned as a class; the previous acts provide only

for the investigation of claims and a future confirmation upon the proof of certain facts. Thus the first section of the act of 2d March, 1805, (Land Laws, vol. 1, p. 122,) providing as to one class of claims, declares that, when proved, they " shall be confirmed ; " the second section, in reference to the claims of settlers, declares that the "-tract of land " proved to have been inhabited and cultivated as required " shall be granted." The first section of the act of 1812, in reference to the village claims, declares that they " shall be and are hereby confirmed." The language of the act of 1805 is precisely that of the English version of the Florida treaty, which was construed to be executory, in Foster *v.* Elam, 2 Peters, 253. That of the act of 1812 is quite as emphatic as the Spanish version of the same clause of the same treaty, which is translated, " shall remain ratified and confirmed," and held to be a present ratification and confirmation in United States *v.* Percheman, 7 Peters, 51.

Again, the third section of the act of 3d June, 1812, provides that every donation claim embraced in the report of the commissioners, and not confirmed on account of some specified cause, " shall be confirmed," and that certain other claims, to the extent of 800 arpens, " shall be confirmed."

The acts of the 12th April, 1814, (Land Laws, vol. 1, p. 242); 29th April, 1816, (Ib. 280); and 4th July, 1836, (Ib. 557,) are acts confirming claims recommended for confirmation by the recorder or commissioners. The first declares that the claimants " shall be, and they are hereby, confirmed in their claims ; " the second, that the claims recommended for confirmation be, and the same are hereby, confirmed ; in the last, the same language is employed in confirming the decisions in favor of the claimants.

In every case where it is declared that claims " shall be confirmed," provision is made for an investigation and adjudication. None such is made by the act of 1812, in relation to the village claims confirmed by the first section. By the fourth section the recorder is required to extract from the books of the commissioners the donation claims directed to be confirmed by the third section. By the eighth section the powers and duties of the commissioners are conferred upon him in relation to donation claims filed under the seventh section, and the claims which had been theretofore filed and not decided on by the commissioners.

It is true that the recorder did examine and report for confirmation many village claims that were confirmed by the act of June, 1812, and that the report was confirmed by the act of 29th April, 1816. The confirmation furnished convenient evidence of title, but it is neither conclusive nor indispensable. Proof of inhabitation, cultivation, or possession, is all that the

law requires, and, when made, establishes a title from the 13th June, 1812, which is superior to a confirmation by the act of April, 1816, unaccompanied by evidence of inhabitation, cultivation, or possession, prior to 20th December, 1803. See Vasseur v. Benton, 1 Mo. Rep. 212, 296; Page v. Scheibel, 11 Ib. 167; Harrison v. Page, 16 Ib. 182.

The information upon which the act of June, 1812, was based, was contained in letters addressed to the Secretary of the Treasury by Mr. Penrose, one of the commissioners, and one addressed to the chairman of the committee on public lands by Mr. Riddick, secretary of the board, which had just then closed its labors and made report, under the provisions of the several acts of Congress for the adjustment of land claims. The letters were written at Washington, dated 20th, 24th, and 26th March, 1812, and are published in Gales & Seaton's edition of State Papers, Public Lands, vol. 2, pp. 447 to 451.

The first letter of Mr. Penrose contains a classification of the claims not finally confirmed. Class 8th embraces claims for out or field lots, as they are termed, which he says "should be confirmed, recorded or not recorded, if those not recorded do not interfere with claims confirmed; all these tracts have been possessed from fifteen to fifty years." Class 9th — "the commons." Class 10th — "town or village lots." He says: "It would probably be best to confirm the town generally to the inhabitants, and if there be any vacant lots, grant them for public schools."

In his second letter, he says: "The five following classes will include nearly all such claims as have sufficient merit to be confirmed." . . . . "Class 5th "embraces claims for towns or villages, then common fields or field lots and their commons, either recorded or not recorded." Mr. Penrose says: "By the spirit of the ordinances all these claims would have been confirmed or granted."

The letter of Mr. Riddick (the secretary) arranges the land claims into 49 classes. The last (49th) embraces "villages, common ; common fields, and lands adjacent, given to the inhabitants individually for cultivation, possessed prior to the 20th December, 1803."

Mr. Riddick says: "The foregoing table or list is intended to show the claims of Louisiana in all the variety of shades in which it is possible for the claimants to place them, out of which a selection may be made of such as are not yet provided for by law; but nevertheless 'ought in justice to be confirmed or granted' to the claimant."

After some suggestions in respect to the other classes, the letter proceeds: "The forty-second, forty-third, and forty-fourth

classes have great merit, and ought to be provided for. It is believed that no actual settlement was made in Louisiana without the express permission of a proper Spanish officer. In fact, the known vigilance of that government was such as to prevent an idea of that kind being entertained a moment. Even the subjects of Spain, old residents of the country, were not permitted to travel from one village to another, a distance of not more than twenty miles, without obtaining from the commandant a passport, in which was specially stated the road to be travelled, going and returning. Under these circumstances, it is impossible that any settlements could have been made without the knowledge of the government."

" The forty-ninth class will comprise nearly one fourth in number of all the claims of the Territory of Louisiana, and, if confirmed at once by the outer lines of a survey to be made by the principal deputy, would give general satisfaction, and save the United States a deal of useless investigation into subjects that are merely matters of individual dispute."

" The United States can claim no rights over the same, except a few solitary village lots, and inconsiderable vacant spots of little value, which might be given to the inhabitants for the support of schools."

" The villages established prior to the 20th December, 1803, are as follows, to wit: " In St. Charles District, St. Charles and Portage des Sioux; in St. Louis District, St. Louis, St. Ferdinand, Maria des Liards, and Carondelet; in St. Genevieve District, St. Genevieve and New Bourbon; in New Madrid District, New Madrid and Little Prairie; in Arkansas District, Arkansas."

These letters suggest every provision contained in the two first sections of the act of June, 1812, the confirmation of the claims of the inhabitants to in-lots, out-lots, common field lots and commons, the survey of an out boundary, and the reservation of vacant lots for the support of schools. They show also the reason why no title paper was required, and no investigation or adjudication provided for, but the claims confirmed at once by force of the act alone.

The act supplementary to the act of 13th June, 1812, approved 26th May, 1824, (Land Laws, vol. 1, p. 397,) and the further supplement thereto, approved 27th January, 1831, (Ib. 478,) show that the act of 1812 was understood by congress to be a confirmation of the village claims *proprio vigore*. The first requires the owners of lots " which were confirmed by the act of June, 1812, on the ground of inhabitation, cultivation, or possession, to designate their respective lots by proving before the recorder the fact of such inhabitation, &c., within eighteen

months. The last is a quitclaim by the United States in favor of the inhabitants of the several towns and villages to the lots and commons confirmed to them respectively by the act of 13th June, 1812."

It was not the object of the supplementary act of 1824 to institute an investigation of village claims, or to require or authorize an adjudication of the rights of claimants. It embraces no unconfirmed claims, and of those confirmed only such as it recognizes to have been confirmed by the act of 1812.

These confirmations had been made without any record or documentary evidence by which it could be ascertained what lots had been confirmed, their extent and boundaries; and, because these facts depended on parol evidence, the surveyor-general could not distinguish the private from the public lots. This evil it was the object of the act of 1824 to remedy as far as practicable, and therefore it provides that the owners of lots confirmed by the act of 1812 (and none other, confirmed or unconfirmed) shall, within a limited period, designate their lots by proof of inhabitation, &c., and their extent and boundaries " so as to enable the surveyor-general to distinguish the private from the vacant lots," or, as it is expressed in the third section, " to serve as his guide in distinguishing them " (the confirmed lots) " from the vacant lots to be set apart as above described," that is, for the use of schools.

The recorder is directed to issue a certificate of confirmation for each claim confirmed, that is, for each claim which, in his opinion, shall have been proved to have been confirmed twelve years before, by force of the act of 13th June, 1812, and it has been held that the certificate is *primâ facie* evidence of such confirmation to the person named in it. Janis v. Gurno, 4 Mo. Reports, 458; but it may be rebutted; and if it is proved that the lot was inhabited, cultivated, or possessed by another person prior to the 20th December, 1803, that title is the best. The act of 1824 does not declare the consequence of a failure by an owner to make the proof required, and certainly cannot be construed to divest the title vested by the act of 1812. Gurno v. Janis, 6 Mo. R. 330; Page v. Scheibel, 11 Ib. 167; Harrison v. Page, 16 Ib. 182; Montgomery v. Landusky, 9 Ib. 705.

A construction of the act of the 13th June, 1812, was for the first time given by the Supreme Court of Missouri, in 1823, in the case of Vasseur v. Benton, 1 Missouri Reports, 212, 296.

(The counsel then examined that case particularly, and also the cases of Lajoye v. Primm, 1 Mo. Rep. 368; Janis v. Gurno, 4 Ib. 458; Gurno v. Janis, 6 Ib. 330; Beihler v. Coonce, 9 Ib. 347; Montgomery v. Landusky, Ib. 705; Page v. Scheibel, 11 Ib. 167; Harrison v. Page, 16 Ib. 182; Russell v. St. Louis

Public Schools, Ib. 553; Gamache *v.* Piquignot, 17 Ib. 310; Soulard *v.* Clarke, MS. March, 1854.)

*Mr. Ewing* made the following points for the defendant in error.

1st. It appears that the claim of the individual inhabitant is confined to the bounds of the village or town.   The plaintiffs cannot claim any thing under this act except a town lot, out lot, common field lot, or commons belonging to St. Louis.   The first question, therefore is, does St. Louis, its common fields or commons, within the provisions of the above-named act, include the land in controversy.   It was never intended by that act that the claim of each inhabitant to the town lot, out lot, common field lot, or commons, should be separately set apart and severed from the national domain, by survey or otherwise; but that the " out bounds " of the town, with its appurtenant common fields and commons, should be surveyed and severed from the national domain by a regularly constituted officer, and then that each inhabitant should have secured to him his rights, whatever they might be, within the bounds of the town.   It was the duty of the town authorities to attend to procuring the survey, and in its execution to guard the interests of the town, and with them the rights of the individual inhabitants.

The law directs that the survey be made " as soon as may be," so that the rights of the town and its inhabitants being defined, all others entitled may assert their claims.   It would not do to allow a claim like that to the commons of St. Louis to remain unmarked, indefinite, hovering like a moving cloud over and around the adjacent titles.   It must therefore be surveyed and its limits defined " as soon as may be."   This was accordingly done.   The precise date of the survey is not given but it was in or prior to 1817, in which year the plat was filed in the general land-office, pursuant to the provisions of the act above cited.   That survey has been acquiesced in for thirty-seven years, and lands have been purchased and titles acquired and transmitted conformably to it for more than a generation. The survey was made by an authorized officer of the United States upon the one side, in the presence and with the actual or implied assent of the city authorities and the interested citizens on the other; and it is now much too late to question it in any quarter.   The evidence on which it is now assailed is the opinion of an experienced surveyor, who thinks the out boundary line of the city ought to have been so projected as to include the land in controversy.   It is not probable that he is better informed as to the state of the city and its appurtenant commons in 1812 than the public surveyor who projected the

out boundary-line in 1816, and the public authorities of the city and the interested inhabitants who at that time witnessed and acquiesced in the said out boundary. But too much time has elapsed — the acquiescence has been too long to admit of evidence or question on the subject of this out boundary, even if the evidence were otherwise entitled to consideration.

2d. But waving this objection, the plaintiffs show no claim whatever under the statute.

The language of the first section, so far as it touches the rights of individuals, is somewhat vague and indefinite. It provides that lots which "have been inhabited, cultivated or possessed prior to the 20th day of December, 1803, shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto." But it does not admit of a construction, which would give to the inhabitants of a town lands which they had occupied and cultivated many years before 1803, and which they had before that time abandoned. The expression, as I have said, is not clear, but the tense of the verb "have been inhabited" implies a continuing inhabitation, &c., down to the time named, December 20th, 1803. The more brief and common expression "were inhabited prior," &c., would convey distinctly the idea that "inhabitation," &c., at any time prior to that date was sufficient. But the word used to transfer title is, I think, decisive of the question — "shall be and is hereby confirmed to," &c. The term "confirmation," implies *proprio vigore*, an existing title or claim on which it is to operate — it can have no effect whatever on an inhabitation, cultivation, or possession, which existed in the indefinite past, but which had been abandoned and was as if it had never existed at the time of the confirmation.

But the second section of the act removes all possible doubt on the subject. The survey having been directed by the first section, the second goes on to provide, "that all town and village lots, out lots, or common field lots, included in such surveys, which are not rightfully owned or claimed by private individuals . . . shall be and the same are hereby reserved for the support of schools. Showing that there must be a present subsisting claim or ownership at the time of the passage of the law. Nothing which was abandoned, prior to its passage, is intended to be restored by it. It saves subsisting rights or claims only.

Whatever possession was in Paul Guitard of the land in question prior to 1796 was abandoned, when the common fence fell down and was abandoned by the town, namely, in 1796–97. From that time until the commencement of this suit in 1853, a period of nearly sixty years, no claim has been set up to these

lands, either by the city or the inhabitants. Twenty years after the fields, once inclosed by the common fence, were thrown open and abandoned, the boundary of the city, its out lots and commons, was settled by the city authorities and a public officer of the United States, and a record duly made thereof in the proper department of the government. The city has ever since acquiesced in its reputed boundary. Private individuals have acquiesced, and it has never yet been disturbed. I submit that it is too late to disturb it now, and unsettle titles which have for a full generation rested undisturbed upon it.

I ought, perhaps, also to notice the singularly unsatisfactory kind of title set up by the plaintiffs in their ancestor, Paul Guitard. They say he cultivated and claimed. But how or by what title did he claim? And where did he possess and cultivate? It might be possible to prove that a flock of crows lighted on the scrub-oaks in the Cul-de-sac sixty years ago, and flew away again, but it would be hard to prove the particular tree on which any one individual crow lighted. The proof is here equally unsatisfactory. There is no more trace left in the one case than in the other; no line drawn, stake set, tree marked, or stone planted, no ancient pile of rubbish to mark the spot claimed by Guitard or any other inhabitant out of the surveyed bounds of the town.

Mr. Justice CAMPBELL delivered the opinion of the court.

The plaintiffs claim a lot of ground in the city of St. Louis, as representatives of Paul Guitard, an ancient inhabitant of that city, under a confirmation in the act of Congress of the 13th of June, 1812, for the settlement of land claims in Missouri. 2 Stat. at Large, 748.

The record shows, that Guitard, from 1785–6 till the common fence which surrounded and protected the field lots and commons of that city was thrown down, in 1797 or 8, claimed and cultivated a parcel of land, one arpen in width and forty in depth, in the Cul-de-sac prairie. The tract claimed was called Guitard's Cul-de-sac field to its whole extent, and was in the usual form of field lots in that village. His cultivation did not extend over the whole claim, nor was it ascertained whether the portion sued for was within that part cultivated. There were eleven other lots of the same description, claimed and cultivated at that period by different persons in the Cul-de-sac prairie lying together, that of Guitard's being to the north of the others. The land sued for is within the survey directed by the first section of the act referred to. The defendant produced a patent from the United States for the land in dispute; but, as the case was determined upon the title of the plaintiffs, that becomes of

no importance. The Circuit Court instructed the jury, "That there having been no concession, nor grant, nor survey, nor permission to cultivate or possess the land claimed by Paul Guitard to said Guitard under and by the Spanish authorities or government; and no location of said claim by or under said government, nor under the French government, and no proof having been made at any time by said Paul Guitard, or those claiming under him, of any inhabitation, cultivation, or possession, or of the location and extent of said claim, either under the provisions of the act of 1812 or those of the act of the 26th of May, 1824, either before the recorder of land titles or other United States' authority; and there having been no survey or location of said land, by or under the authority of the United States, the said plaintiffs cannot now set up said claim and locate it, and prove its extent and inhabitation and cultivation by parol evidence merely." This instruction comprehends the entire case, and the examination of this will render it unnecessary to consider those given or refused upon the motions of the parties to the suit.

The act of the 13th of June, 1812, declares "that the rights, titles, claims to town or village lots, out lots, common field lots, and commons in, adjoining, and belonging to the several towns and villages named in the act, including St. Louis, which lots have been inhabited, cultivated, or possessed prior to the 20th of December, 1803, shall be and they are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto."

This act has been repeatedly under the consideration of this court, and to ascertain what has been decided upon it will facilitate the present inquiry. In Chouteau v. Eckhart, 2 How. 345, the defendant relied upon the title of the village of St. Charles to the locus in quo, as being a part of the commons of that village, and confirmed to it by the act of June, 1812. In that case, the right of the village was established from a concession made by the lieutenant-governor of Upper Louisiana, and a formal survey by the Spanish authority. The judgment of this court was, that a title of this description was confirmed by the act of 1812, and that this confirmation excluded a Spanish concession of an earlier date, which had been confirmed by a subsequent act of Congress.

In the case of Mackay v. Dillon, 4 How. 421, the defendant defended under the claim of St. Louis to its commons, and produced evidence of a Spanish concession, of a private survey which had been presented to the board of commissioners, and of proof having been made before the recorder of land titles. Whether the private survey made in 1806, and submitted to the

government, was conclusive of boundary, was the question before the court. Mr. Justice Catron, in delivering the opinion of the court, says, "By the first section of the act of 1812 Congress confirmed the claim to commons adjoining and belonging to St. Louis, with simila claims made by other towns. But no extent or boundaries were given to show what land was granted; nor is there any thing in the act of 1812 from which a court of justice can legally declare that the land, set forth in the survey and proved as commons by witnesses in 1806, is the precise land Congress granted: in other words, the act did not adopt the evidence laid before the board for any purpose; and the boundaries of claims thus confirmed were designedly, as we suppose, left open to the settlement of the respective claimants by litigation in courts of justice or otherwise."

Again in the case of Les Bois v. Bramell, the same learned judge says of this act, "that this was a general confirmation of the common to the town as a community, no one ever doubted, so far as the confirmation operated on the lands of the United States."

The questions settled by this court are that the act of 1812 is a present operative grant of all the interest of the United States, in the property comprised in the act, and that the right of the grantee was not dependent upon the factum of a survey under the Spanish government.

No question before this has been submitted to the court upon the interpretation to be given to the "rights, titles, and claims" which were the subject of the confirmation of the United States.

The instruction given to the jury by the Circuit Court implies that the confirmee, before he can acquire a standing in court, must originally have had or must subsequently have placed upon his title or claim an additional mark of a public authority besides this act of Congress; — that he must evince his right or claim by some concession, survey, or permission to settle, cultivate, or possess, or some recognition of his claim under the provisions of some act of Congress by some officer of the executive department, indicative of its location and extent. The laxity of the legislation in the act of 1812 is painfully evident, when the fact is declared that the large and growing cities of the State of Missouri have their site upon the land comprehended in this confirmation. Nevertheless an attempt to correct the mischief would probably create more confusion and disorder than the act has produced.

The act, in the form in which it exists, was adopted by Congress upon the solicitation and counsel of citizens of Missouri, interested in the subject and well acquainted with the conditions of its population. The towns and villages named in it

43 *

were then, and for many years continued to be, small, and the
property of no great importance.   During this time conflicting
rights and pretensions were adjusted, facts necessary to sustain
claims to property ascertained, and the business and intercourse
of the inhabitants accommodated to its conditions.   The act
itself, with all the circumstances of the inhabitants before and
at the time of its passage, have formed the subject of legal judg-
ments and professional opinions upon which mighty interests
have grown up and now repose.   This court fully appreciates
the danger of disturbing those interests and of contradicting
those opinions and judgments.

The act of 1812 makes no requisition for a concession, survey,
permission to settle, cultivate, or possess, or of any location by
a public authority as the basis of the right, title, and claim, upon
which its confirmatory provisions operate.   It may be very true
that there could have been originally no legitimate right or claim
without some such authority.   Congress, however, in this act,
was not dealing with written or formal evidences of right.  Such
claims in Missouri have been provided for by other acts.  These
pretensions to town and village lots formed a residuum of a
mass of rights, titles, and claims, which Congress was advised
could be equitably and summarily disposed of by the abandon-
ment of its own rights to the property, and a reference of the
whole subject to the parties concerned.   Congress afforded no
means of authenticating the rights, titles, and claims of the seve-
ral confirmees.   No board was appointed in the act to receive
the evidence nor to adjust contradictory pretensions.

No officer was appointed to survey or to locate any individual
right.   All the facts requisite to sustain the confirmation —
what were village or town lots, out lots, common field lots,
or commons — what were the conditions of inhabitation, culti-
vation, or possession, to bring the claimant within the act, were
referred to the judicial tribunals.   The act has been most care-
fully and patiently considered in the Supreme Court of Missouri,
and conclusions have been promulgated, which comprehend
nearly all the questions which can arise upon it.

In Vasseur *v.* Benton, 1 Mo. Rep. that court says, " we are
of opinion that the claims to town or village lots, which had
been inhabited, cultivated, or possessed, prior to the 20th of De-
cember, 1803, are by the express words of the act *ipso facto* con-
firmed as to the right of the United States."   In Lajoye *v.*
Primm, 3 Mo. Rep. 368, the court says, " the great object of
the act was to quiet the villages in their titles to property (so
far as the government was concerned) which had been acquir-
ed in many instances by possession merely, under an express
or implied permission to settle, and which had passed from

hand to hand without any formal conveyance. In such cases possession was the only thing to which they could look; and taking it for granted that those who were found in possession at the time the country was ceded, or who had been last in possession prior thereto, were the rightful owners — the confirmation was intended for their benefit." In Page *v.* Scheibel, 11 Mo. 167, the same court says "the whole history of the progress of settlements in the French villages, so far as it has been developed in the cases which have come up to this court, shows that the villagers did not venture to take possession of the lots, either for cultivation or inhabitation, without a formal permission of the lieutenant-governor, or the commandant of the post. These permissions, it is also probable, were most generally in writing, and accompanied by a survey made by an officer selected and authorized by the government.

But the title of the claimants under this government does not depend upon the existence or proof of any such documents. Congress did not think proper to require it. In all probability, the fact that possession, inhabitation, and cultivation could not exist under the former government without such previous permission from the authorities of that government, was known to the framers of the act of 1812, and constituted the prominent reason for dispensing with any proof of this character in order to make out a title under that act. However this may be, the act requires no such proof, but confirms the title upon possession, inhabitation, or cultivation alone, without regard to the legality of the origin of such title."

We have quoted these portions of the reports of those cases to express our concurrence in the conclusions they present.

We shall now inquire whether it was necessary for the confirmee to present the evidence of his claim under the act of 1824, (4 Stat. at Large, 65,) supplementary to the act of 1812?

This act makes it the duty of the claimants of town and village lots "to proceed, within eighteen months after the passage thereof, to designate them by proving the fact of inhabitation, &c., and the boundaries and extent of each claim, so as to enable the surveyor-general to distinguish the private from the vacant lots." No forfeiture was imposed for a non-compliance. The confirmee by a compliance obtained a recognition of his boundaries from the United States, and consequently evidence against every person intruding, or claiming from the government *ex post facto.* The government did not by that act impair the effect and operation of its act of 1812.

Under the act of 1812 each confirmee was compelled, whenever his title was disputed, to adduce proof of the conditions upon which the confirmation depended. As the facts of inha-

bitation, possession, and cultivation at a designated period, are facts *in pais*, it followed as a matter of course that parol evidence is admissible to establish them. In the case of Hickie *v.* Starke, 1 Pet. 98, a question arose upon an act of Congress which confirmed to " actual settlers " within a ceded territory all the grants legally executed prior to a designated day, and this court held that the fact of " a settlement on that day " must be established, and proof of occupancy and cultivation was adduced. In the city of Mobile *v.* Eslava, 16 Pet. 235, certain water lots were confirmed to the proprietors of the front lots adjacent thereto, who had improved them before the passage of the act of Congress, and this court sustained the title upon parol proof of location and improvements. The court said " being proprietor of the front lot and having improved the water lot opposite and east of Water street, constitute the conditions on which the right, if any, under the statute vests. In his charge to the jury, the judge laid down these conditions in clear terms ; and instructed the jury, if the facts brought the defendant within them, that they should find against the plaintiffs. The jury did so find, and this is conclusive of the facts of the case."

The question of boundary under the act of 1812, as it was decided in Mackay *v.* Dillon, was left open to the settlement of the respective claimants by litigation, in the courts of justice, or otherwise. Nor has this court, in any case, decided that statutes, which operate to confirm an existing and recognized claim or title with ascertained boundaries, or boundaries which could be ascertained, are inoperative without a survey, or made one necessary to the perfection of the title. A survey, approved by the United States, and accepted by the confirmee, is always important to the confirmee; for, as is said by the court in Menard's Heirs *v.* Massy, 8 How. 294, it is conclusive evidence as against the United States, that the land granted by the confirmation of Congress was the same described and bounded by the survey, unless an appeal was taken by either party or an opposing claimant to the commissioner of the land-office. This consideration depends upon the fact that the claimant and the United States were parties to the selection of the land ; for, as they agreed to the survey, they are mutually bound and respectively estopped."

The cases of Harrison *v.* Page, 16 Mo. 182 ; Gamache *v.* Piquignot, 17 Mo. 310, which has been affirmed at the present session of this court; and Soulard *v.* Clarke, are in harmony with the views we have expressed upon the latter branch of the instructions of the Circuit Court.

We think it proper to state, that we express no opinion upon the effect of the evidence to establish the plaintiff's title as a subsisting title, and none upon the claim to such of the land as lies

·beyond the boundary line, settled by the survey of the United States under the first section of the act of 1812.

The judgment of the Circuit Court is reversed and the cause remanded.

### Order.

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the District of Missouri, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged, by this court, that the judgment of the said Circuit Court, in this cause, be, and the same is hereby reversed, with costs; and that this cause be, and the same is hereby remanded to the said Circuit Court with directions to award a *venire facias de novo.*